**CARL BEASLEY FORD, INC.**

v.

**BURROUGHS CORPORATION.**

Civ. A. No. 71–31.

United States District Court,
E. D. Pennsylvania.

July 13, 1973.

Stephen M. Feldman, Philadelphia, Pa., for plaintiff.

Harry A. Short, Jr., Philadelphia, Pa., for defendant.

## OPINION

LUONGO, District Judge.

Carl Beasley Ford, Inc. (Beasley), a Ford dealer, bought from Burroughs Corporation (Burroughs), the manufacturer of the equipment, electronic accounting equipment (E–4000 Series) to produce records required under Beasley's franchise agreement with Ford Motor Company. Contending that the equipment failed to perform as warranted, Beasley instituted this suit to recover the purchase price and consequential damages. The case presents many interesting and novel questions relating to Pennsylvania law under the Uniform Commercial Code, 12A P.S. § 1—101 et seq.

In a bifurcated trial, the issues were submitted to the jury under Federal Rule of Civil Procedure 49(a) for special verdict, and the jury answered interrogatories as follows:

### (LIABILITY)

"1. Did the plaintiff and defendant enter into an oral understanding and agreement for the furnishing by defendant to plaintiff of programming for the E–4000 machine purchased by plaintiff?

Yes X No __

If your answer to # 1 is "YES":

2. Did the defendant agree to provide programming which would perform the functions which had been performed by the Reynold & Reynolds books and produce information necessary to preparation and submission of Ford Financial Reports?

Yes X No __

3. Did the plaintiff rely on the defendant's skill and judgment in selecting and furnishing suitable programming for the E–4000 accounting machine?

Yes X No __

4. Did the defendant promise and agree to provide such programming for the E–4000 machine by January 2, 1970?

Yes X No __

5. Did the defendant provide, by January 2, 1970, programming adequate to accomplish the purposes contemplated by the agreement and understanding between the parties?

Yes __ No X

6. If your answer to # 5 is "NO", did defendant provide such programming within a reasonable time after January 2, 1970?

Yes __ No X

If your answer to both # 5 and # 6 is "NO":

7. Did the plaintiff reject the E–4000 machine within a reasonable time after it knew or should have known that defendant would not provide programming adequate to accomplish the purposes contemplated by the agreement and understanding between the parties?

Yes X No __

8. Did the plaintiff at anytime accept the E–4000 machine and the programs submitted by defendant?

Yes __ No X

9. If your answer to #8 is "YES", specify when.

_____"

### (DAMAGES)

"1. Is the plaintiff entitled to recover the purchase price of the E–4000 equipment?

Yes X No __

(If your answer is "YES" the parties have agreed that the purchase price is $35,000.)

2. Is the plaintiff entitled to recover interest paid on the loan by which the purchase price was paid?

Yes <u>X</u> No __

(If your answer is "YES", the parties have agreed that the interest paid is $5,600.)

3. Is plaintiff entitled to recover any of the following items as consequential damages. If so, fill in the amount; if not, leave the amount blank.*

(a) Overtime to employes $NONE
(b) Extra help $ 867.50
(c) Accountant's services $16,840.00
(d) Computer services $ 6,704.82

4. Is defendant entitled to credit for accounting service fees which would have been paid to Reynolds & Reynolds during 1970 if defendant's equipment had not been purchased?

Yes <u>X</u> No __

If your answer is "YES", indicate how much credit should be given to defendant. $9,000"

By its special verdict, the jury found that the parties had entered into an oral agreement under which Burroughs had agreed to program the equipment by January 2, 1970; that Burroughs had failed to provide, by that date or within a reasonable time thereafter, programs which would perform the functions which had previously been accomplished by Reynolds & Reynolds; that plaintiff had never accepted the equipment and the programming; and that it had rejected the E–4000 within a reasonable time. The jury found that plaintiff was entitled to specific items of damages totalling $56,012.32.

Before the court are Burroughs' motions for judgment n. o. v., or, in the alternative, for a new trial.

---

\* In the court's charge, this was changed to the request to write in the word "None".

1. At that time Burroughs' practice was to sell the equipment and the programming under a "bundled" price, i. e. the price for the equipment was the same whether

## FACTS

Viewing the evidence in the light most favorable to the verdict winner, the jury could reasonably have found the following facts:

By a writing dated June 19, 1969 (P–2), Burroughs undertook to sell and deliver to plaintiff an E–4000 electronic accounting machine for $35,000. Not included or referred to in the writing was an oral agreement between the parties that, by January 2, 1970, Burroughs would furnish thirteen programs which would enable the machine to to produce accounting records such as had theretofore been produced by Reynolds & Reynolds, records which were required by Beasley for submission to Ford Motor Company under the franchise agreement. The price of the programming service was included in the price of the equipment.[1]

Negotiations for the sale of the machine and for the programming to be furnished were conducted, on Burroughs' behalf, by its salesman, John Cibula. Under Burroughs' practice, salesmen were authorized to enter into such agreements and it was primarily the salesman's responsibility to do the programming, with assistance, where needed, from Burroughs' technical programming personnel.

The equipment was delivered in October, 1969, and the payroll program, the first of the thirteen programs, was installed in November, 1969. Shortly thereafter, Cibula assured plaintiff's general manager that the remaining twelve would be completed and installed in the equipment by January 2, 1970, and that plaintiff should give the required 30 days' notice to cancel its arrangement for the processing of its records by Reynolds & Reynolds as of the end of December, 1969.

Burroughs did the programming or not. For anti-trust reasons, this practice was later discontinued by Burroughs and separate prices were quoted for equipment and for programming, and separate agreements entered into. See footnote 4, *infra*.

Cibula, the salesman who sold the equipment to plaintiff and who was responsible for the programming, left Burroughs during the first week of December. The programming was then taken over by the Zone Sales Manager, Gerald Smyser, and by a salesman for an adjoining territory.

None of the remaining twelve programs was presented (i.e. installed and tested in the equipment) by the agreed date, January 2, 1970. Two programs were submitted in mid-January and additional programs were submitted, at the rate of one or two a month, until June, 1970, when the final program was introduced into the machine. By this time plaintiff had fallen behind in its record keeping and had failed to submit timely reports to Ford Motor Company.

The difficulties did not end with the installation of the thirteen programs. Three of the promised programs were particularly essential to the conduct of plaintiff's business. One of the three related to accounts receivable. In that program it was essential to have an analysis of accounts showing the amount owed by each customer and how much of the balance was current, and how much was 30, 60, 90 and 120 days past due. The program submitted by defendant failed to operate correctly and at times the age analysis showed a portion past due greater than the total amount of the customer's balance. Another program, the general ledger trial balance, was designed to collect all of the accounts and give their monthly and year to date balances. The general ledger trial balance was essential to the preparation of the financial statements which were required to be furnished to Ford Motor Company, on a monthly basis, on or prior to the 10th day of the succeeding month. The program submitted failed to produce the required year to date figures. The third crucial program which did not operate properly was that relating to new car and truck sales. The program was intended to give the gross profit for each month and inventory information such as types and price of vehicles in stock, and their inventory values. The program was defective in that, from time to time, the machine cleared, eliminating totals, and presenting thereafter a distorted picture of sales, inventory, etc.

As a result of the faulty performance of the E–4000, plaintiff fell far behind in the posting of its accounting records. The office staff began compiling the accounting records by hand. The services of IBM were secured to run the warranty and policy records, car and truck sales, and the general ledger. Burroughs supplied a second E–4000 and plaintiff hired extra personnel to operate the machine. Finally, when all the attempts to catch up failed, plaintiff brought in its accountants to completely reconstruct its accounting records for the calendar year 1970.

Throughout the entire time plaintiff had kept Burroughs advised of the difficulties it was having. Despite substantial efforts by Burroughs' personnel, the difficulties were not corrected. As late as September, 1970, one of Burroughs' officials assured plaintiff that plaintiff's accounting records would be current by November 1, 1970. When that failed to come to pass, on December 11, 1970, plaintiff's counsel wrote a letter to Burroughs rejecting the E–4000 machine.

### *Motion for Judgment N.O.V.*

At trial, plaintiff sought to impose liability for Burroughs' breach of contract on two theories: (1) Burroughs' failure to deliver the machine and its programs by January 2, 1970, the agreed upon date, or within a reasonable time thereafter, and (2) failure of the programs to perform as agreed.

Burroughs argues that it is entitled to judgment notwithstanding the verdict (a) because plaintiff's payment of the purchase price and subsequent use of the E–4000 machine while adjustments were made constituted a waiver of the lateness claim, and (b) as to the defective programs claim, although plaintiff's

proof established that incorrect results were obtained, it failed to show that the incorrect results were caused by faulty programming, rather than by operator error or machine malfunction.[2] Burroughs contends that plaintiff's failure to produce expert testimony attributing the bad results to faulty programming is fatal to plaintiff's claim of breach of contract.

(a) Burroughs' contention that plaintiff waived its claim based on late delivery is governed, generally, by Article 2 of the Uniform Commercial Code, 12A P.S. § 2—101 et seq., and, in particular by §§ 2—602 and 2—606.

§ 2—602, provides, in pertinent part:

"(1) Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller."

§ 2—606, entitled "What Constitutes Acceptance of Goods", provides:

"(1) Acceptance of goods occurs when the buyer * * *

(b) fails to make an effective rejection (subsection (1) of Section 2—602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him."

Burroughs argues that, as a matter of law, plaintiff failed to effectively reject the equipment within a reasonable time after delivery, and it must therefore have accepted it within the meaning of § 2—606, thereby waiving any claim of breach for late delivery.

■ I do not agree that the facts of this case require a finding, as a matter of law, that there was no timely rejection under § 2—602. In speaking to a comparable section (§ 69) of the predecessor Sales Act of 1915, relating to

time within which to rescind. Justice Stern in Franz Equipment Co. v. The Leo J. Butler Co., 370 Pa. 459, 467–468, 88 A.2d 702, 707 (1952) stated:

"What is a reasonable time within which to give such notice depends upon the circumstances of each case and is a question of law for the court . . . . Here it could not be fairly ascertained by defendant whether the [machine] fulfilled the requirements of the contract until it had been tested by actual operation. The tests which were employed revealed defects of various kinds, and [buyer] properly gave to the manufacturer the opportunity to make such adjustments, repairs and replacements as might correct them; it was only after all such attempts were ineffectual that defendant became obliged to notify [seller] of its election to rescind the sale. In Kirk Johnson Co., Inc., v. Light, 100 Pa.Super. 425, 427, 428, it was pointed out that where the article sold is a machine which is the subject of adjustment or repair the situation differs from one where defects or breaches of warranty are at once discoverable; it was there said . . . that 'He [defendant] was not bound to rescind the contract and insist on the instrument being removed as long as there was a reasonable likelihood of the plaintiff's being able to overcome the defects, and it desired the chance to do so. Plaintiff's continual attempts to fix the instrument, conformably to its guaranty, did not deprive defendant of his right to rescind as soon as he was satisfied that it could not be made to work satisfactorily.' "

See also, L&N Sales Co. v. Stuski, 188 Pa.Super. 117, 146 A.2d 154 (1958); Kaminsky v. Levine, 106 Pa.Super. 278, 161 A. 741 (1932).

Here the period of adjustment of the programming of the E–4000 equipment took up at least eight months, not an unwarranted amount of time in view of the

2. If it was due to machine malfunction, Burroughs relies on a specific provision in

P–2 limiting its liability to replacement of defective parts.

complexity of the machine. On April 9, 1970, plaintiff wrote a letter (P–3) in which the various deficiencies were identified and. warned that the machine would be rejected unless all the enumerated matters were corrected. As late as September 11, 1970, Burroughs notified plaintiff by letter (P–17) that "Burroughs will do all that we can to be of assistance to you in resolving the operating problems of your installation", and on September 14, 1970, Burroughs, also by letter (P–13), assured plaintiff that its accounting would be caught up by November 1. On December 11, 1970, counsel for plaintiff wrote a letter to defendant rejecting the equipment.

*Franz Equipment* indicates that the reasonableness of time should have been ruled upon by the court. Instead, at defendant's request, this was left to the jury to determine, although the court had indicated that plaintiff had clearly acted within a reasonable time.[3]

There was no failure to make a timely rejection. As late as September 14, 1970, Burroughs continued to assure plaintiff that matters would be corrected and the work brought up to date by November 1, 1970. The notice of rejection, written six weeks after the November 1 date passed, was reasonable. The use of the machine by plaintiff during all the period of "experimentation" did not constitute an acceptance.

■ (b) Burroughs contends that plaintiff failed to prove that the inaccurate records were caused by programming deficiencies rather than by machine defects or by operator error. In this breach of contract suit, plaintiff might well have carried its burden simply by proving that defendant had promised to produce a result (accounting records suitable for its purposes) and that defendant had failed to do so, leaving it to defendant to establish, as a matter of defense, that the errors were due to plaintiff's own personnel, but plaintiff did not stop there. For example, as to the malfunction of the "aging" aspect of the accounts receivable program, plaintiff presented evidence that after a Burroughs' representative had suggested that the cause was incorrect coding of input cards by plaintiff's employees, the Burroughs representative then coded the cards himself and, nevertheless, the program failed to produce the required aging of accounts. Further, as to the deficiency in the trial balance program, plaintiff presented the testimony of a Burroughs' employee that the program submitted by Burroughs did not include provision for the required "year to date" figures. And with respect to the new car and truck sales program, plaintiff presented testimony, again by a Burroughs' employee (a salesman), that the cause of the difficulty was defective programming. (N.T. 5–42). There was, thus, ample evidence to support the jury's finding that the inaccurate records produced by the Burroughs equipment was caused by deficiencies in the programming.

■ (c) Burroughs argues that plaintiff was obligated to establish, by expert testimony, that the inaccuracies in the records were attributable to faulty programming. This argument appears to stem from confusing negligence principles with those applicable to breach of contract cases. As noted above, plaintiff's obligation was simply to prove that defendant had agreed to produce a result and had failed to do so. The reasons for the failure, if they were of a nature to absolve defendant, were defendant's burden to establish. If there was an obligation to produce expert testimony, it was defendant's obligation, not plaintiff's.

The motion for judgment n. o. v. will be denied.

---

3. "THE COURT: (Speaking to defendant's counsel) All right, if you want me to submit the issue to the jury, but I really think there is very little evidence in this case that at any point Beasley was willing to accept what had been submitted to them. It seems to me that the evidence is quite clear that the experimentation, for want of a better word, continued until the point of Beasley's frustration, and they quit." (N.T. 6–79)

*Motion for New Trial*

The various grounds assigned by plaintiff in support of its motion for new trial will be discussed seriatim.

A. *The Court erred in permitting the jury to determine what the contract was between the parties.*

At trial, plaintiff produced a document entitled "Equipment Sale Contract," dated June 19, 1969 (P–2). This document contained a clause waiving consequential damages. The court, exercising its function to interpret written agreements, ruled that P–2 did not cover programming for the equipment, and so instructed the jury. Burroughs maintains that P–2 constituted the entire agreement between the parties and that it was error to permit the jury to determine whether there was an oral contract for programming and to determine what the terms of the oral agreement were.

■■ The evidence produced in the instant case amply justified submission of the issue to the jury. Where there is a dispute as to which set of several circumstances, some expressed in writing and some oral, constitutes the agreement between the parties, it is the jury's function and not the court's to determine which set of circumstances constitutes the true agreement. See Philadelphia v. Stewart, 201 Pa. 526, 51 A. 348 (1902); Jessop v. Ivory, 172 Pa. 44, 33 A. 352 (1895); and see McCormack v. Jermyn, 351 Pa. 161, 40 A.2d 477 (1955). Furthermore, as to Burroughs' contention that the agreement covered the programming aspect of the transaction as well as the sale of the machine, this statement from Gianni v. Russell & Co., Inc., 281 Pa. 320, 324, 126 A. 791, 792 (1924) controls:

"In cases . . . where the cause of action rests entirely on an alleged oral understanding concerning a subject which is dealt with in a written contract it is presumed that the writing was intended to set forth the entire agreement as to that particular subject. 'In deciding upon this intent [as to whether a certain subject was intended to be embodied by the writing], the chief and most satisfactory index . . . is found in the circumstances whether or not the *particular element of the alleged extrinsic negotiation is dealt with at all* in the writing. If it is mentioned, covered, or dealt with in the writing, then presumably the writing was meant to represent all of the transaction on that element; if it is not, then probably the writing was not intended to embody that element of the negotiation.' Wigmore on Evidence (2d Ed.) vol. 5, p. 309." (Emphasis in original)

■ P–2 contained no reference [4] to the terms of a programming agreement. There is no mention that the equipment would produce accounting records required by Ford, that thirteen programs were to be installed, no mention of the purpose for which they were designed and no agreed upon date for completion. These factors provided ample justification for the court's decision to permit the parol evidence relating· to the al-

---

4. There was an incidental mention in the printed portion of P–2 to programming. However, it quite clearly had nothing to do with an agreement to provide programming. The printed portion dealt only with buyer's obligation to make payment for the equipment, regardless of delays in delivery or installation, etc. The printed portion in question provided: "The requirement for service on the equipment or the need for an extended period to complete installation of or training on applications and programming on Seller's equipment shall not justify failure of Purchaser to comply with its payment commitments hereunder. Seller shall deliver, install and service the equipment as promptly as is reasonably possible, but shall not be held responsible for delay in delivery, installation or service, nor in any event under this agreement for more than an exchange of equipment under its warranty, upon return of the equipment to Seller with Seller's prior written consent. (Purchaser hereby expressly waives all damages, whether direct, incidental or consequential.)

leged oral understanding. Whatever doubt there was as to correctness of this decision was dispelled when Burroughs' own employees testified that Burroughs' salesmen were instructed not to incorporate programming into written agreements for the sale of equipment, but to enter into instead oral agreements with the purchasers regarding the programming to be provided with the equipment. It was conceded that the equipment without programming was virtually worthless. These admissions by defendant's representatives furnished ample support for the conclusion that the writing did not encompass the entire agreement between the parties, and parol evidence was properly received to establish what the terms of the agreement were. Ward v. Zeigler, 285 Pa. 557, 132 A. 798 (1926); see also Yuhas v. Schmidt, 434 Pa. 447, 456–457, 258 A.2d 616 (1969).

■ Burroughs contends that even if there was an oral agreement as to programming, the waiver of consequential damages clause, contained in P–2, must be included as one of the terms of that oral agreement. Burroughs was permitted to argue to the jury that the oral agreement included at least that portion of the writing, but the jury quite apparently rejected the argument. As noted above, where the terms of an oral agreement are in dispute, it is the jury's function to resolve the dispute.

B. *Errors in the Court's treatment of the damage aspect of the case.*

The Uniform Commercial Code provides, with respect to remedies for breach of contract, inter alia:

"§ 2—711. Buyer's Remedies in General; Buyer's Security Interest in Rejected Goods

(1) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (Section 2—612), the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid

(a) 'cover' and have damages under the next section as to all the goods affected whether or not they have been identified to the contract; . . .

\* \* \* \* \* \*

"§ 2—712. 'Cover'; Buyer's Procurement of Substitute Goods

(1) After a breach within the preceding section the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

(2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (Section 2—715), but less expenses saved in consequence of the seller's breach.

\* \* \* \* \* \*

"§ 2—715. Buyer's Incidental and Consequential Damages

\* \* \* \* \* \*

(2) Consequential damages resulting from the seller's breach include

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; . . ."

Burroughs has raised the following issues with respect to damages.

1. *The programming contract must be considered by itself to determine the measure of damages.*

■ At trial, plaintiff disclaimed any recovery for damages based upon defects in the machine itself. Burroughs argues that since the evidence indicated that the price of the machine, including programming, was $35,000, and since no evidence was presented as to the sepa-

rate price of the programming, and since plaintiff had disclaimed any right to recover for defective equipment, there was no evidence upon which the jury could have arrived at a proper amount of damages for improper programming.

In making this argument, Burroughs has overlooked a very important part of the proof in this case. There was testimony at trial that the E–4000 machine was virtually worthless without proper programming; that, at the time of the sale, Burroughs sold the equipment at a "bundled" price, i. e., the price was the same whether or not the customer had Burroughs do the programming, thus virtually forcing the customer to accept Burroughs' programming.[5] It was quite apparent, therefore, that although two separate agreements were used, one in writing for the physical equipment, and the other oral to cover the programming of the equipment, the two were virtually inseparable insofar as the utility of the equipment was concerned. It appears appropriate, therefore, to allow the return of the entire purchase price as an element of damage for breach of the agreement to furnish proper programming.

■ Burroughs contends further that the true measure of damages is the cost of securing proper programming of the machine. I have no dispute with that statement of law. See Taber v. Porter-Gildersleeve Co., Inc., 271 Pa. 245, 114 A. 773 (1921); Gaylord Builders, Inc. v. Richmond Metal Mfg. Corp., 186 Pa.Super. 101, 140 A.2d 358 (1958). The disagreement really arises as to who has the burden of proof in matters relating to mitigation of damages. Plaintiff's evidence established that the equipment was worthless without proper programming; that Burroughs, the manufacturer of the equipment (and presumably "the expert" in the programming of its own equipment) was unable to program it to function properly. Under the circumstances, I believe that it was Burroughs' burden to establish that there were available sources of programming known, or which should have been known, to plaintiff to furnish that which Burroughs had failed to produce (see discussion infra at pp. 19–20). Burroughs produced no such evidence.

## 2. Interest as an element of damage.

■ Burroughs argues that the court erred when it permitted the jury to award, as an element of consequential damage, interest charges paid by plaintiff for the purchase of the E–4000. The matter is not at all free from doubt. I find no authority for the allowance of interest on indebtedness as an element of "price" as that term is used in § 2–711 of the Uniform Commercial Code. See Wagner Tractor, Inc. v. Shields, 381 F.2d 441 (9th Cir. 1967). On the other hand, the nature and price of this equipment was such that "at the time of contracting [Burroughs] had reason to know" that plaintiff would borrow money to purchase this capital item, thereby establishing the interest charge as an item of consequential damage under § 2–715. I am frank to state that there is no evidence in the record establishing what normal business practice and custom is with regard to the purchase of such items, but on balance (and acknowledging reservations) it appears a properly allowable item of consequential damage.

5. A practice shortly thereafter abandoned. The anti-trust implications of "bundled" pricing had, at about the time of plaintiff's negotiations with Burroughs, resulted in the filing of several suits in which this practice was alleged to be a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. See Control Data Corp. v. International Business Machines Corp., (3–68 Civ. 312 (D.Minn. Third Division)); Data Processing Financial & General Corp. v. International Business Machines Corp., (3–69 Civ. 157 (S.D.N.Y. 69 Civ. 19)); Applied Data Research, Inc. v. International Business Machines Corp., (3–69 Civ. 158 (S.D.N.Y. 69 Civ. 1682)); Programatics, Inc. v. International Business Machines Corp., (3–69 Civ. 159 (S.D.N.Y. 69 Civ. 2185)). And see Control Data Corp. v. IBM Corp., 1970 CCH Trade Cases ¶73,297 (D.Minn.1970).

3. *Accounting fees, additional help and computer services.*

Because of the inaccuracy and unreliability of the records produced by the Burroughs equipment, plaintiff brought in its accountants to reconstruct its records and balance sheet for 1970. Some of the records which had been produced by the machine were available to the accountants while they were so engaged, but the equipment itself was not used in any of the reconstruction work. Burroughs argues that its equipment should have been used and that, if it had been, the expense would have been considerably reduced.

In addition, plaintiff hired outside help to get caught up in its record keeping, incurred charges by outside computer firms to perform some of the work which the Burroughs equipment should have performed, and used some of its own personnel on an overtime basis.

Burroughs' basic argument as to all these items, of course, is that consequential damages are barred by reason of the clause in the writing (P–2). Apart from that, its position is essentially that plaintiff failed to prove that it used the most economical means available to undo the harm caused by Burroughs' breach, i. e. that plaintiff had the burden to prove that it had mitigated damages.

 Plaintiff was undoubtedly under an obligation to mitigate damages, but it was defendant's burden to prove that plaintiff had failed to do so. Roadway Express Co., Inc. v. Highway Truck and Helpers, Local 107, 299 F. Supp. 1058, 1063 (E.D.Pa.1969); Watsontown Brick Co. v. Hercules Powder Co., 265 F.Supp. 268 (M.D.Pa.1967), aff'd, 387 F.2d 99 (3d Cir. 1967); Williams v. Masters, Mates & Pilots of America, Local No. 2, 384 Pa. 413, 120 A.2d 896 (1956). Burroughs' contentions as to the unreasonableness of the accountants' fees, as to the lack of necessity for other computer services and outside help, were all submitted to the jury and rejected. Its contention that plaintiff had failed to prove that over-

time by its own employees was attributable to Burroughs' breach was apparently accepted by the jury and no award made for that item. All of these items were properly submitted for resolution by the jury and the jury's findings have ample support in the evidence.

4. *The Court erred in permitting proof of damages which were not set forth in plaintiff's pretrial memorandum or its answers to interrogatories.*

 In its pretrial memorandum, plaintiff claimed (in addition to return of the purchase price) two basic items of damage; loss of profits in its business from lack of proper records; and specific items of expense incurred. At trial, plaintiff abandoned the claim for loss of profits and pursued only the claim for expenses incurred. Burroughs complains that it was prejudiced because plaintiff was permitted to prove expenses in amounts above and beyond those set forth in the pretrial memorandum. I believe that what was done here was within the allowable range of a trial judge's discretion, see Moore v. Sylvania Electric Products, Inc., 454 F.2d 81, 84 (3d Cir. 1972), particularly in view of the fact that counsel for defendant made no request for postponement of trial to enable him to investigate the additional amounts claimed.

C. *Other Assignments of Error.*

1. *Error in permitting the cross-examination of a defense witness to exceed the scope of direct examination.*

Burroughs called one of its former employees, T. D. Ketterman, to the stand. He testified that he visited plaintiff's establishment in June, 1970, and spoke to two of plaintiff's employees who stated that the programs that they were using were satisfactory but that there were some programs that had not yet been run.

On cross-examination, it was brought out that Ketterman had been engaged as a consultant by Burroughs "to find out what was wrong and to make some recommendations as to what might be done

to correct the situation." (N.T. 5–52). Counsel for Burroughs made no objection at this point. After plaintiff's counsel elicited further information about two other visits, Burroughs' counsel, at side bar, expressed the view that further cross-examination would exceed the scope of the direct.

■ In my view, when Burroughs' counsel brought out that Ketterman went to plaintiff's showroom at Burroughs' request, the whole subject of plaintiff's complaints about, and dissatisfaction with, the equipment and anything Ketterman did with respect to those complaints was fair game for cross-examination. Even applying the rule as enunciated in Moyer v. Aetna Life Ins. Co., 126 F.2d 141, 143 (3d Cir. 1942), that "a party has no right to cross-examine any witness except as to facts and circumstances connected with the matters stated in his direct examination" the questioned cross-examination was permissible because the matters explored on the cross-examination of Ketterman were "circumstances connected with" his direct examination. See also Sleek v. J. C. Penny Co., 324 F.2d 467, 474 (3d Cir. 1963); Union Automobile Indemnity Association v. Capitol Indemnity Ins. Co., 310 F.2d 318, 321 (7th Cir. 1962). Under the Proposed Rules of Evidence the cross-examination was unquestionably proper.[6]

2. *Admission of letters into evidence.*

Two letters from plaintiff or its counsel to Burroughs, containing statements bearing upon liability and damages, were admitted into evidence. It is Burroughs' position that the letters were self-serving and prejudicial and should have been excluded.

■ The letters were properly admitted on two grounds. First, there was a factual issue as to acceptance and

rejection, and plaintiff's letters of complaint were clearly relevant to that issue. See *Pritchard v. Liggett & Myers Tobacco Company*, 295 F.2d 292, 298–299 (3d Cir. 1961). Secondly, Burroughs responded to both letters without contradicting or denying the factual assertions contained therein, consequently the letters constitute admissions by Burroughs. See *Chambers v. Montgomery*, 411 Pa. 339, 343, 192 A.2d 355 (1963); *Tranter Mfg. Co. v. Blaney*, 67 Pa.Super. 378 (1917).

3. *Deficiency in operating instructions as a basis for breach of contract.*

Burroughs' last point is that it was error to charge the jury that a deficiency in instructions could serve as a basis for a breach of contract. Plaintiff's general manager had testified that he did not contend that plaintiff's employees could not operate the equipment because of a lack of an operations manual. Burroughs argues that plaintiff was bound by that testimony and was therefore not entitled to have that issue submitted to the jury.

■ The questioned submission was made because there was evidence, in defendant's case, which raised serious questions concerning whether the instructions in the manual furnished by Burroughs were sufficient to enable plaintiff's personnel to operate the equipment properly. (See N.T. 5–56; 5–62; 5–72). Under these circumstances I believe the submission was proper under the principle stated in *Guenther v. Armstrong Rubber Co.*, 406 F.2d 1315, 1318 (3d Cir. 1969):

"[A] plaintiff's testimony is not a judicial admission when it . . . relates to an objective matter about which he might honestly be mistaken, . . . where there is other evidence in the case, including the ad-

---

6. See Proposed Rules of Evidence for United States Courts and Magistrates. "611. * * *
(b) Scope of cross-examination. A witness may be cross-examined *on any matter relevant to any issue in the case,* including credibility. In the interests of justice, the judge may limit cross-examination with respect to matters not testified to on direct examination." (Emphasis added)

verse party's, which is more favorable to him, even though it conflicts with his own testimony, since a party may be mistaken in his testimony, like any other witness; in other words, a party is regarded as not bound by his own testimony where there is contradictory evidence or circumstances which the trier of fact might fairly believe."

This is such a case. Plaintiff's general manager was admittedly not an expert in electronic accounting equipment. Ketterman was. The jury was entitled to pass judgment on the adequacy of the instructions notwithstanding plaintiff's testimony.

The motion for new trial will be denied.