No. 81-117

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

---

RUBEN C. STEINMETZ,

Plaintiff and Appellant,

-vs-

RANDY ROBERTUS and DAVID ROBERTUS,

Defendants and Respondents.

---

Appeal from: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone
Honorable Robert Wilson, Judge presiding.

Counsel of Record:

For Appellant:

Anderson, Brown, Gerbase, Cebull and Jones, Billings,
Montana

For Respondents:

Thomas L. Bradley, Laurel, Montana

---

Submitted on briefs: August 27, 1981

Decided: DEC 1 - 1981

Filed: DEC 1 - 1981

*Thomas J. Kearney*
_____
Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

In an action for the purchase price of an irrigation pump, plaintiff appeals an unfavorable judgment of the court, sitting without a jury, in the Thirteenth Judicial District, Yellowstone County. Plaintiff claims an acceptance of the pump on the part of the defendants with a consequent obligation to pay the purchase price. Defendants claim the pump was improperly installed and subsequently damaged, and they have refused to pay for the pump.

Plaintiff presents the following issues for review:

1) Whether the District Court erred in failing to make findings of fact and conclusions of law with regard to acceptance, rejection, and revocation of acceptance under the Uniform Commercial Code.

2) Whether there is sufficient evidence to support the findings of fact (particularly finding of fact no. 3), conclusions of law and judgment.

We affirm the District Court, holding (1) the District Court's findings of fact and conclusions of law show that the defendants did not accept the pump as acceptance is defined in the Uniform Commercial Code, and (2) there is substantial evidence to support the District Court's findings of fact.

Plaintiff is a salesman of farm seed and irrigation products in Joliet, Montana. Defendants own and run a farm in Carbon County. Between January and April of 1977, plaintiff, defendants, and Roy Bucklin, discussed the proposed installation of an irrigation system on defendants' land. Roy Bucklin was the president of Pipe and Pump Supply of Greybull,

-2-

Wyoming, which supplied the irrigation systems to plaintiff salesman. Two bids were submitted and rejected. Defendants paid $2,000 on April 25, 1977. On May 1, 1977, plaintiff and defendants made an oral agreement for the sale to defendants of an irrigation system for the price of $19,829, which covered the price of the system less installation charges and variations in the price of the pump. Both parties agreed that the plaintiff had the obligation to install and test the irrigation system.

Defendants had requested a Western Land Roller pump which was unavailable. Plaintiff substituted a Fairbanks Morse pump, which, according to plaintiff was designed for the type of wheel row irrigation system ordered by defendants. Whether defendants agreed to the substitution prior to the plaintiff's ordering the Fairbanks Morse pump is disputed. The horsepower of the substituted pump was lower, the price higher, than that of the pump initially requested.

Because the Fairbanks Morse pump would not be received until some days after the wheel rows themselves were installed, and because, in that drought year, early irrigation was essential, plaintiff supplied defendants with a temporary tractor-run pump. The main line and wheel rows were completely installed by May 10, 1977. The tractor-run power-take-off pump (PTO) was installed approximately May 14, 1977, and functioned properly, supplying sufficient water. On May 19, 1977, defendants paid plaintiff an additional $13,384.00, which covered the purchase price of everything but the pump and its installation.

The installation of the pump required the digging of a sump excavation for water which would supply the pump through a 4'x8'x8' metal-walled pipe or sump. Mr. Bucklin

specified the location and dimensions of the excavation when he and the plaintiff visited defendants' farm in mid-May. Bucklin also designed the metal-walled sump. The excavation for the sump was dug by Adams Construction the day after the visit of Bucklin and Steinmetz. Neither Bucklin nor Steinmetz was present to supervise the excavating. The metal sump arrived and was installed approximately two weeks later. Before installation, the sump excavation was re-dug, because of cave-ins. After the sump was installed, the pump was attached to the sump. Because the pump's column was too long to fit down into the sump, the pump was raised by nailing railroad ties together, chaining them to the sump, and bolting the pump to the top tie. Bucklin testified that he did not attach a screen to the pump, that such a screen was optional, and that the sump was screened. Plaintiff, Bucklin, and a couple of helpers supervised the installation which took all of the day of June 5, 1977. Because electricity had not yet been extended to the system, plaintiff, Bucklin, and helpers departed before the pump was turned on, as did plaintiff the following day when the wiring was not completed by nearly noon.

The water in the sump was "dirty . . . mucky looking," according to defendants, and when they turned the pump on, the pump ran a few minutes, then quit. No water ever came out of the pump. A relative "probed around in the bottom of the sump and found it was full of mud and rock."

That evening defendant called plaintiff, complaining that the pump did not work. The plaintiff responded that he would try to come out the following morning. Defendants hired another party, who cleaned the sump the next day, but the pump failed to pump any water. Plaintiff was unable to

-4-

come out that day, and when defendant called him that evening, a heated conversation ensued in which, according to plaintiff, defendant Randy Robertus threatened his life. Defendant denies he made the threat but agrees that he became quite angry, and demanded that plaintiff call Bucklin so the matter could be settled that night.

That same evening, plaintiff testified, Bucklin advised plaintiff to stay out of the matter and away from the Robertus farm. Bucklin then called defendant Randy Robertus, and assured him he would come out and check the pump. In fact, Mr. Bucklin removed the pump, which he testified was choked with "pieces of corn stalks, sand and gravel," which could damage the pump if left in it for any length of time. Bucklin cleaned the pump and his hired man returned it in several days. Bucklin testified that the pump was undamaged, but admits that this time he did install a screen in the pump. The hired man, James Jones, testified that when he installed the pump after Bucklin cleaned it, it worked "for a short time until it sucked all the water out" of the sump. He also testified that when he returned after the 4th of July to pick up the PTO pump, the defendants had supplied more water from an irrigation ditch and Randy Robertus made no complaint, but indicated he was pleased with the electrical pump (the Fairbanks Morse). Both Bucklin and plaintiff testified that there was no further complaint about the working of the pump until October, well after the end of the irrigating season, when defendants' father telephoned plaintiff and demanded that plaintiff take back the pump because it did not work properly. Plaintiff presented six witnesses, all of whom testified to "driving by" the Robertus farm and seeing the wheel rows irrigating the field of

barley.

Defendants deny that they told Mr. Jones the system "pleased" them; in fact, they testified that on at least three occasions, they called Bucklin, complaining to his wife or secretary that the pump was not functioning properly. Bucklin never responded to their complaints. Defendants testified that, for almost two weeks, they tried to make the pump run right, switching water from one wheel row to the other, then to both, then moving the wheel rows and trying again. They claim to have run the pump 24 hours a day to no avail; its inefficient operation failed to irrigate the fields sufficiently, and they suffered a severe crop loss in the fields, which produced only 20 bushels per acre of barley instead of the anticipated 80 bushels. Their testimony was corroborated by a neighbor who testified that the pump never worked properly. Defendants replaced the Fairbanks Morse pump in spring of 1978 at a cost of approximately $4,000.00.

After harvest, in October of 1977, the defendants' father contacted plaintiff and told him to come and get the pump -- it didn't work, and defendants did not intend to pay for it. Plaintiff refused to accept the pump and demanded full payment for the pump and installation costs, a total of $4,865.00.

The original action against the defendants was instituted by Pipe and Pump Supply. Defendants denied the allegations in the complaint and alleged that Pipe and Pump Supply was a Wyoming corporation without a certificate of authority to do business in Montana and had no standing to sue. Defendants counterclaimed against Ruben Steinmetz requesting that plaintiff take nothing by their action and seeking damages

-6-

in the amount of $6,000.00.  Subsequently, third-party
defendant Steinmetz counterclaimed against defendants Robertus.
Defendants Robertus moved for dismissal of the complaint of
Pipe and Pump Supply and the counterclaim by Steinmetz.  The
motion was granted by the District Court on September 5,
1979, and, in a Nunc Pro Tunc order dated September 14, 1979,
the court ordered that the motions to dismiss be granted
without prejudice.  Steinmetz filed an amended complaint
against defendants Robertus on October 12, 1979, alleging
the sale of a wheel row irrigation system at an agreed upon
price of $20,249.00 and defendants' failure to pay the
balance of $4,865.00, and requesting judgment in the amount
of the balance due and costs.  Defendants denied all allegations.

Trial was had on December 11, 1980.  On December 15,
1980, the District Court entered its findings of fact and
conclusions of law and entered judgment for the defendants,
dismissing plaintiff's complaint and awarding costs to the
defendants.  Plaintiff appeals.

I

The District Court's findings of fact and conclusions
of law are as follows:

"FINDINGS OF FACT

"1.  That the plaintiff and the defendants on
April 25, 1977, entered into an agreement
whereby plaintiff was to provide and install
a wheel roll irrigation system, together with
a pump, for the price of $20,249.00, which
consisted of the sum of $13,384.00 for the
wheel roll sprinkler and $4,365.00 for the
pump; that defendants have paid $13,365.00
for the wheel roll system.  [Defendants made
a $2,000.00 down payment on the wheel roll
system in April, and paid an additional
$13,384.00 in May.  The total price of the
wheel roll system was $15,384.00.  The cost
of the wheel rolls, plus the unpaid amount --
$4,365.00 for the pump and $500.00 for its
installation -- brought the contract amount
to $20,249.00.]

"2.  That the wheel roll irrigation system
was to be installed and working upon defen-
dants' farm in Carbon County, Montana, with-
in ten (10) days.

"3. That the plaintiff failed to properly install said pump in that the pump was installed in a sump that was filled with mud and trash; that no screen was placed over the intake of said pump; that the pump drew in mud and trash and was damaged; that the plaintiff failed to test said pump or irrigation system; that as a consequence the pump failed to work and failed to adequately irrigate the lands of the defendants as called for in the agreement.

"4. That the defendants were forced to remove the pump of the plaintiff and subsequently had to purchase a new pump from another supplier.

"5. That defendants offered to return the pump to the plaintiff but that plaintiff refused to accept the same and refused to make the wheel roll system operable.

"From the foregoing Facts, the Court draws the following:

"CONCLUSIONS OF LAW

"1. That the plaintiff has failed to provide an operable pump as required under his agreement with the defendants.

"2. That the defendants have offered to return plaintiff's pump, but plaintiff refuses to accept the same.

"3. That plaintiff's complaint should be dismissed and judgment entered in favor of the defendants."

Plaintiff argues that because neither the defendants' answer denying plaintiff's allegations nor the District Court's findings of fact and conclusions of law specifically addressed the questions of acceptance, rejection, and revocation as set forth in Montana's Uniform Commercial Code, this Court must reverse and remand with orders to the District Court to enter judgment in favor of the plaintiff. Plaintiff cites Ballantyne v. The Anaconda Company (1978), 574 P.2d 582, 175 Mont. 406, as requiring findings of fact and conclusions of law in support of a judgment. While the Court in that case did describe the purpose and function of a written

-8-

opinion, the Court directed the case be remanded to the District Court which was directed to set forth the reason for its order granting plaintiff's new trial in accordance with Rule 59(f), M.R.Civ.P., which specifically requires that a court granting new trial shall specify the grounds with sufficient particularity as to apprise the parties and the appellate court of the rationale underlying the ruling.

Certainly this Court would much prefer a more precise and detailed statement of findings of fact and conclusions of law than those prepared by the District Court in deciding this action. We approve the quotation in Ballantyne from the comment of Chief Justice Hughes: "[A] well-stated opinion is of great assistance to the appellate court as a chart of the reasoning followed by the trial judge in reaching a decision." Ballantyne v. Anaconda Co, 175 Mont. at 409, 574 P.2d at 584. As set forth in Rule 52(a), M.R.Civ.P., the applicable standard for our review of findings of facts is:

> "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

We cannot say that the trial court's findings of fact in this case were clearly erroneous, in light of the evidence presented and the consistency of the findings with the UCC's provisions governing rejection of non-conforming goods.

Montana UCC states in relevant part:

> "30-2-601. . . . [I]f the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may:

> "(a) reject the whole. . .

> "30-2-602. (1) Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller.

"30-2-606. (1) Acceptance of goods occurs when the buyer:

"(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their noncomformity; or

"(b) fails to make an effective rejection (subsection (1) of 30-2-602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

"(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him." Section 30-2-601 et. seq., MCA.

There was substantial evidence to support the following conclusions:

(a) The goods were non-conforming or were improperly delivered. The parties are agreed that it was part of the agreement, and a matter of common practice in the irrigation equipment trade, for the seller to supervise the installation of an irrigation system and test its performance. Here, both plaintiff and his supplier were present the day the pump was installed and yet there were a number of questionable occurrences. The screenless pump drew in sufficient debris to clog it before any water was pumped to the wheel rows. Both Bucklin and plaintiff Steinmetz left the farm before the irrigation pump was tested. Neither Bucklin nor plaintiff returned to the farm to test the system after its "cure" and ascertain that it was functioning properly; their observations were limited to what they could see "driving by" the farm.

(b) There was a failure to cure the defects of the pump. Defendants contacted plaintiff early and emphatically, the day after the pump's installation, clearly indicating that it did not work. They made a number of unsuccessful attempts after the attempted "cure" to contact Bucklin, who admittedly was fulfilling plaintiff's duties following the

-10-

harsh exchange between plaintiff and Randy Robertus, without any response from Bucklin.

(c) Finally and perhaps most importantly, defendants' ten to twelve days' "use" of the pump in June or early July was in fact a prolonged effort to determine why the pump failed to work and to cure the defect themselves in the absence of any response by the plaintiff (or Bucklin) to defendants' complaints. As such, it was never an act inconsistent with seller's ownership under Section 30-2-606(1)(c), MCA, but rather a reasonable and timely inspection of the pump, under Section 30-2-606(1)(b), MCA, to determine if it was or could be in conformity with the agreement. The Montana Power records indicate that the pump was not used for "several months," as plaintiff charges, but for no more than two weeks total. Defendants testified that, for nearly that length of time, they tried, without success, every conceivable variation of rigging up the wheel rolls and changing their location to try to make the pump work as plaintiff had assured them it would work.

Montana's Uniform Commercial Code provides ". . . acceptance does not occur until the buyer has had a reasonable opportunity to inspect [the goods]." Section 30-2-606(1)(b), MCA. When the goods in question can only be inspected by putting them to the use for which they are intended, a reasonable time for inspection naturally will be longer than if the goods are items whose conformity or nonconformity can be determined simply by looking at them.

A court must be realistic in appraising the sufficiency of a buyer's opportunity to inspect, and should not hold that the buyer has accepted where because of the technical or complex nature of the goods the buyer cannot determine

whether thay are satisfactory until he actually makes use of them.  2 Anderson, Uniform Commercial Code, (2d ed. 1971) (Supp. 1981), 191-192.  When a buyer attempts to cooperate with the seller, and "work the bugs out" of a complex piece of machinery by briefly putting the machinery to its intended use, he should not be acting at his peril.  Courts should be hesitant to find that such acts are inconsistent with the seller's ownership.  See White and Summers, Uniform Commercial Code (2d ed. 1980), 300.

Here, defendants were assured that the pump in question was designed to supply two to three wheel rows with adequate water.  Defendants' use of the pump can be considered the "period of experimentation" recognized in Carl Beasley Ford, Inc. v. Burroughs Corp. (E.D. Pa. 1973), 361 F.Supp. 325, aff'd. in unpub. op., (3rd Cir.), 493 F.2d 1400.

It is generally held that mere notification of poor quality is not sufficient to constitute rejection under the Uniform Commercial Code.  See Southeastern Steel v. Burton Block & Concrete (1979), 273 S.C. 634, 258 S.E.2d 888, and cases cited therein.  Here we find more than mere notification.  Defendant Randy Robertus twice contacted plaintiff before the attempted "cure" of the pump's defects; defendants three times contacted Roy Bucklin, who was acting on plaintiff's behalf, after the ineffectual "cure" of those defects; and defendants, who had paid the total price of the wheel roll system within days of its installation, refused to pay any part of the pump purchase price over a period of several months.

We find that the District Court's findings of fact and conclusions of law are not inconsistent with the Montana UCC despite that court's regrettable failure to develop a clear

-12-

statement of the facts as they relate to applicable Montana law on sales. Under the facts of this case, there was no acceptance by the defendants, no actual use inconsistent with the ownership of the plaintiff, and no delay in offering a return of non-conforming goods significant enough to justify a conclusion that defendants had accepted the pump.

II

Plaintiff argues that there is not substantial evidence supporting the District Court's findings of fact. We have already discussed much of the relevant evidence. This Court will uphold findings based on conflicting evidence when there is substantial evidence on the whole record supporting such findings. The evidence must be viewed in the light most favorable to the prevailing party. Weston v. Kuntz (1981), _____ Mont. _____, _____ P.2d _____, 38 St.Rep. 1691, 1693; Toeckes v. Baker (1980), _____ Mont. _____, 611 P.2d 609, 611, 37 St.Rep. 948, 950; Hagfelt v. Mahaffey (1978), 176 Mont. 16, 18, 575 P.2d 915, 916-917.

There is ample evidence of an agreement that plaintiff would supply a pump capable of providing two, perhaps three, wheel rows with adequate water, and that plaintiff would supervise the installation and testing of the system once it was installed. There is substantial evidence that the system did not operate at all initially, and that following defendants' complaints and nonpayment for the pump and installation, plaintiff's supplier, at plaintiff's request, attempted to fix the pump. Defendants have presented substantial evidence that the pump never functioned properly and was never made effective despite defendants' continued protests to plaintiff's supplier who was acting as plaintiff's middleman after the June 17th quarrel between plaintiff and defendant

-13-

Randy Robertus. Defendants testified that as a result of the pump's failure, a significant portion of the barley crop was lost, and defendants purchased a new pump the following spring.

We find there is substantial evidence supporting the District Court's findings of fact.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____
Justices