Commonwealth of Pennsylvania, Department of Property and Supplies, Appellant, v. Henry A. Berger and Samuel A. Berger, t/d/b/a The Executive House, Appellees.
Henry A. Berger and Samuel A. Berger, t/d/b/a The Executive House, Appellants, v. Commonwealth of Pennsylvania, Department of Property and Supplies, Appellee.

334

Argued September 10, 1973, before President Judge
Bowman and Judges Kramer, Mencer, Rogers and
Blatt. Judges Crumlish, Jr. and Wilkinson, Jr. did
not participate.

*Gerry J. Elman,* Deputy Attorney General, with
him *Israel Packel,* Attorney General, for Common-
wealth.

*Charles B. Zwally,* with him *James A. Ulsh, Robert
E. Woodside* and *Shearer, Mette, Hoerner & Woodside,*
for the Executive House.

Opinion by Judge Blatt, November 20, 1973:

Henry A. Berger and Samuel A. Berger (the Ber-
gers) are the owners and operators of a high-rise apart-
ment-office building in Harrisburg, known as the Execu-
tive House. The building was erected in 1966 and
1967, with the original plans calling for the first three
floors to be designed for office use and the upper floors
to be designed as apartments.

Prior to completion of the Executive House, the Bergers entered into leasing negotiations with the Department of Public Welfare (DPW), and, because the first three floors had been leased before these negotiations were concluded, an agreement was reached to rent the fourth and fifth floors to the DPW; these, of course, had been laid out as apartments. On June 20, 1967, the Bergers and the DPW, the latter acting through the Department of Property and Supplies (DPS),[1] entered into a five-year lease for the fourth and fifth floors, with the effective date of the lease being October 1, 1967, but it being further provided that "no rentals shall be due or payable until the premises are completed to the satisfaction of and occupancy by the Department of Public Welfare. All rentals shall abate during non-occupancy." Exhibit "C", which was attached to and made part of the lease, provided that the Bergers would submit detailed plans and specifications pertaining to their proposed alterations to DPW for approval by July 15, 1967 and that, if such approval was not received by August 1, 1967, the Bergers could, at their option, cancel this lease. It was also provided that, if the building was not complete and ready for occupancy by December 1, 1967, the DPW could cancel the lease at its sole option.

Following execution of this lease, the Bergers continued with the originally planned construction of the fourth and fifth floors, completing the floors as apartments as shown in the Typical Floor Plan submitted to DPW and DPS prior to June 20, 1967. On November 15, 1967, however, when neither the DPW nor the DPS had notified the Bergers of any requested alterations, the Bergers notified the DPW that the two floors were

---

[1] The DPS is authorized to enter into such agreements on behalf of other Commonwealth departments by Section 2402(d) of The Administrative Code of 1929, Act of April 9, 1929, P. L. 177, as amended, 71 P.S. §632(d).

available. The Bergers then also requested the DPW to advise when it intended to take possession. Thereafter the DPS Secretary notified the Bergers that the removal of all facilities on the fourth and fifth floors would be required along with the installation of certain telephone cables, and the Bergers replied that this would be impossible. Despite continued negotiations between the parties, the Commonwealth refused either to take possession of the premises or to pay any rent, finally cancelling the lease on February 2, 1968. The Bergers subsequently filed a complaint with the Board of Arbitration of Claims (Board), which, on March 6, 1973, made an award against the Commonwealth and in the Bergers' favor in the amount of $273,170.00.

Our scope of review on an appeal from an order of the Board is governed by Section 8(c) of the Act of May 20, 1937, P. L. 728, as amended, 72 P.S. §4651-8(c). "[W]e must affirm the order unless it was not in accordance with law or there is an absence of substantial evidence to support the findings of the Board as to the facts. Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *John McShain, Inc. v. General State Authority*, 9 Pa. Commonwealth Ct. 427, 431, 307 A. 2d 469, 472 (1973).

The Board's findings of fact were to the effect that, prior to June 20, 1967, the Bergers submitted a Typical Floor Plan for the fourth and fifth floors to appropriate officials of the DPW and the DPS, and that this Plan showed the floors laid out as apartments. Following the signing of the lease, the Bergers made numerous efforts to find what alterations the DPW would require but were given no guidance, even though officials in the DPW knew that both floors had been designed as apartments and that some alterations would surely be necessary for use by the DPW. Significantly, too, the Board found that plans were even drawn up by

the DPW regarding their proposed use of these floors, which would have required only the removal of 6-10 partitions between apartments and a few other changes, but these plans were never submitted to the Bergers.

The Board further found that, shortly after the lease was executed, a new Secretary of the DPW was appointed, who decided that the DPW should try to break the lease by submitting plans to the Bergers as if only the shell of the building was involved, disregarding the existence of apartment walls, kitchens, bathrooms and closets, although their existence was actually well known to the DPW and the DPS. The DPW then requested the DPS to cancel the lease, and the Bergers were on November 28, 1967 sent the proposed alterations, which would literally involve the gutting out of both completed floors. These plans, moreover, were not detailed or construction plans. The Board found that the DPW had adamantly refused to take possession and eventually cancelled the lease.

A careful review of the record indicates substantial evidence to support these findings by the Board. The Commonwealth, however, objects to the Board's going outside the four corners of the lease in taking testimony regarding the negotiations and other extrinsic factors. It also questions the result reached by the Board, even if the facts so found by the Board are assumed correct. We shall attempt here to deal with each of the Commonwealth's objections.

### ADMISSION OF PAROL EVIDENCE

The Commonwealth argues that it was error, because of the parol evidence rule, for the Board to hear evidence of negotiations which had led to the lease and of DPW's "knowledge" and "intent" regarding the two floors. "The parol evidence rule . . . provides that where parties to an agreement commit their undertak-

ings to a writing with the intention that it shall formally and comprehensively evidence the terms of their agreement, the writing, when executed by the parties, cannot thereafter be made subject to parol alteration, contradiction or variance by way of agreements or understandings had prior to or contemporaneously with the execution of the writing." *International Milling Company v. Hachmeister, Inc.,* 380 Pa. 407, 414, 110 A. 2d 186, 189-190 (1955). The parol evidence rule is not simply one of evidence but of substantive law. *Lefkowitz v. Hummel Furniture Company,* 385 Pa. 244, 122 A. 2d 802 (1956). "The question as to whether the parol evidence rule is applicable is to be determined by the court and depends on whether the writing 'formally and comprehensively evidence the terms of their agreement.'" *Levy v. Leaseway System, Inc.,* 190 Pa. Superior Ct. 482, 487, 154 A. 2d 314, 316 (1959). In order to alter a written instrument by using parol evidence to show that terms have been omitted, it is necessary to allege and show that the terms relied upon were omitted by reason of fraud, accident, or mistake. *Adams v. Frederickson,* 384 Pa. 32, 119 A. 2d 240 (1956). "In a written contract the intent of the parties is the writing itself and when the words are clear and unambiguous the intent is to be determined only from the express language of the agreement." *Robert F. Felte, Inc. v. White,* 451 Pa. 137, 143, 302 A. 2d 347, 351 (1973).

It is also true, however, that "[i]n order to exclude parol evidence the writing must be a complete contract, importing a full legal obligation with no uncertainty as to the terms of the agreement. . . . If the writing does not fully state the entire agreement among the parties, the parol evidence rule has no application. . . ." *Rosenfeld v. Rosenfeld,* 390 Pa. 39, 49, 133 A. 2d 829, 834 (1957). "[P]arol evidence is admissible to explain and supplement a written agreement where such evidence *clearly* shows that the writing in question was

not intended to and did not properly state the entire agreement between the parties." (Emphasis in original.) *Dunn v. Orloff*, 420 Pa. 492, 496, 218 A. 2d 314, 316 (1966). *See Coal Operators Casualty Co. v. Charles T. Easterby & Co., Inc.*, 440 Pa. 218, 269 A. 2d 671 (1970). "Where a written contract admittedly does not contain the full and exact agreement of the parties, parol evidence is admissible to establish the terms of the agreement." *Levy v. Leaseway System, Inc., supra*, 190 Pa. Superior Ct. at 488, 154 A. 2d at 317. "Where a written contract is ambiguous or conflicting, or its meaning is doubtful or obscure, parol evidence is admissible to clarify the ambiguity and to resolve the doubts, in order to ascertain and determine the intention of the parties. . . ." *Foulke v. Miller*, 381 Pa. 587, 593, 112 A. 2d 124, 127 (1955).

The Board held that the lease was ambiguous regarding plans, alterations and facilities and it therefore admitted parol evidence to clear up such ambiguity. Although we do not disagree with the Board's finding as to the ambiguity of the lease, it is not for that reason alone that we here likewise approve of the admission of parol evidence. The purpose of such parol evidence was not to alter the clear provisions of the lease, but to shed light on those areas to which the lease speaks little or not at all. The most obvious such area pertains to the description of the space to be leased.

As the Board indicated, the intent of the parties as to the make-up of the space to be leased is most important in determining who, if anyone, breached such lease. And, of course, "in construing a lease, just as construing any other contract, it is the intention of the parties that must govern." *Pittsburgh v. Charles Zubik & Sons, Inc.*, 404 Pa. 219, 222, 171 A. 2d 776, 778 (1961). We cannot find that the Board erred in determining that the initial intention of the parties was that the fourth and fifth floors would be completed as

apartments, subject to reasonable alterations. We also think that there was substantial evidence to show that the Commonwealth understood that the alterations it eventually did request could not possibly be complied with and that in fact the request was made in terms designed to break the lease. Such findings do not in and of themselves, of course, control as to the issue of who is at fault for the breach of contract, but they do provide an understanding of the full and exact agreement of the parties as evidenced by the lease, and thus assist in its proper interpretation.

### SATISFACTION

The Commonwealth argues that the lease specifically provides for no rentals to be due and payable to the Bergers until the premises were "completed to the satisfaction of and occupancy by" the DPW. Since the premises were neither found "satisfactory" nor occupied by the DPW, it is contended that no obligation for rent arose, especially in view of the additional provision that all rentals were to abate during non-occupancy.

The test of whether or not performance by one party is "satisfactory" to the other party is not whether the person for whom the service was rendered *ought* to be satisfied, but whether he *is* satisfied. *Jenkins Towel Service v. Tidewater Oil Company*, 422 Pa. 601, 223 A. 2d 84 (1966) ; *Burke v. Daughters of the Most Holy Redeemer, Inc.*, 344 Pa. 579, 26 A. 2d 460 (1942). "There are, however, two limitations inherent in this principle: (1) that the dissatisfaction must be genuine and not prompted by caprice or bad faith, and (2) that if the work is not sufficiently completed for a reasonable determination whether it was or would be satisfactory, then the rejection is premature." *Hood v. Meininger*, 377 Pa. 342, 347, 105 A. 2d 126, 128 (1954). Whether or not there is a basis for a bona fide dissatisfaction is

properly a question for the finder of fact (here the Board). *Cf. Kramer v. Philadelphia Leather Goods Corporation,* 364 Pa. 531, 73 A. 2d 385 (1950).

The Board here found that the DPW knew that the floors involved were designed for apartment use, that they were being so constructed and that some changes and alterations were to be made so that they would be usable by the DPW. In fact, a plan for such alterations was drawn up but never submitted to the Bergers. The DPW decided instead to break the lease and sought to accomplish this result by preparing new plans as if only the shell of the building was involved, completely ignoring apartment walls, kitchens, bathrooms and closets. Such findings of the Board are supported by substantial evidence and they therefore tend to establish that the Commonwealth's dissatisfaction was not arrived at in completely good faith. The Commonwealth should therefore not be relieved of its obligations under the lease on the ground that it was not "satisfied."

## EXHIBIT "C"

As noted above, Exhibit "C", which was attached to and made part of the lease, provided that detailed plans and specifications pertaining to proposed alterations would be submitted by the Bergers to the DPW and the DPS for approval by July 15, 1967, and, in the absence of such approval by August 1, 1967, the *lessor* could cancel the lease. It also provided that, unless the building was complete and ready for occupancy by December 1, 1967, the *lessee* could cancel the lease. The Board made a finding of fact that neither party exercised its option to cancel the lease under the terms of Exhibit "C". The Commonwealth takes exception to this finding, however, pointing to the lease-cancelling letter of February 2, 1968 from the Secretary of the DPS to the Bergers, which provides as a basis for cancelling the lease: "4. You have failed to submit a floor

plan and outline pertaining to the alteration of the structure on or before July 15, 1967 as required by Exhibit C to the said document."

Even if we might agree with the Commonwealth that it cancelled the lease, in part at least, because of the failure of the Bergers to submit plans and specifications, there is little or no evidence that it canceled because of any failure to have the building complete and ready for occupancy by December 1, 1967, and the question arises therefore as to whether or not the provisions of Exhibit "C" provided a valid basis on which the Commonwealth *could* cancel the lease.

It might be noted initially that Exhibit "C" gives neither party the specific authority to cancel the lease because of a failure to file plans and specifications pertaining to proposed alterations. The *lessor* (the Bergers), however, was given the authority to cancel the lease if the plans to be submitted by July 15, 1967 were not approved by August 1, 1967, and the *lessee* (the DPW) was given authority to cancel if not given occupancy by December 1, 1967, but no such cancellation occurred.

Moreover, even conceding for the moment that the Commonwealth had authority to cancel the lease because of the Bergers' failure to submit the plans and specifications, the facts in his case would not in any way warrant the exercise of such authority. The facts as found by the Board show that the Bergers made numerous attempts to obtain from the DPW and the DPS information as to the alterations they wanted so that adequate plans and specifications could be drawn up. Such proposed alterations were never submitted to the Bergers, even though proposals therefor were drawn up by the DPW. It was thus made impossible for the Bergers to comply with the provision of Exhibit "C" requiring them to submit plans and specifications as to alterations, and it is well settled that, where one party

to a contract is himself the cause of a failure of performance by the other party, he cannot take advantage of his own failure. *Miles v. Metzger*, 316 Pa. 211, 173 A. 285 (1934).

Because, therefore, the failure of the DPW to submit their proposed alterations was the cause of the Bergers' failure to submit plans and specifications for such alterations, the Commonwealth cannot base its cancellation upon such failure.

## FHA AGREEMENT

Prior to entering into the lease in question, the Bergers had entered into an agreement with the Federal Housing Administration insuring their mortgage on Executive House. Section 6(h) of that agreement provided: "Owners shall not without the prior written approval of the Commissioner . . . permit the use of the dwelling accommodations or nursing facilities of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Commissioner." The Commonwealth contends that the failure of the Bergers to seek FHA approval of the proposed non-apartment use of the fourth and fifth floors amounts either to a breach of duty to the FHA or to a fraud on the Commonwealth (because the Bergers had no intention or ability to fulfill the terms of the lease). We cannot agree.

It is clear that a tenant is precluded from refusing to pay rent on account of any possible defects in his landlord's title, and evidence of such defects is irrelevant and inadmissible in an action for the rent. *McRoberts v. Stadelman*, 168 Pa. Superior Ct. 489, 79 A. 2d 119 (1951); *Babcock Lumber Company v. Allison*, 136 Pa. Superior Ct. 353, 7 A. 2d 374 (1939).

In any case, however, there is no evidence in the record that the FHA would not have approved the pro-

344

posed use of the fourth and fifth floors, and the Bergers were hardly at fault in failing to seek such approval before the DPW had yet indicated its proposed alterations. Inasmuch as the Commonwealth had refused to submit these proposed alterations or to take possession under the lease, it was not necessary at that time for the Bergers to seek any approval from the FHA.

Moreover, there is no evidence in the record that the Commonwealth refused to take possession because of the FHA agreement. In fact, this appears to have been an afterthought raised for the first time long after this action was begun before the Board. There is also no evidence that the Bergers could not have fulfilled the lease, and it might be noted that, subsequent to the Commonwealth's cancellation here, the fourth floor actually was leased to the Department of Justice, and there was no apparent difficulty caused by the FHA agreement.

### Breach of the Lease

Upon a complete review of the record and a consideration of the Commonwealth's arguments, we must conclude that the Commonwealth breached the lease without a valid basis for so doing. The evidence is clear that the Commonwealth entered into the lease with full knowledge of the fact that the premises were designed as apartments and were to be concluded as such with only certain alterations necessary to make them usable by the DPW. The new Secretary of the DPW subsequently decided to break the lease and thereafter refused to discuss or submit proposed alterations until eventually submitting a totally unreasonable and unrealistic proposal to gut both floors. The Bergers abided by the terms of the lease to the best of their ability and presented no basis for a cancellation of such lease by the Commonwealth.

The Board was thus correct in awarding damages to the Bergers.

## INTEREST

The Bergers have also brought an appeal to this Court from the failure of the Board to include interest in its award.[2]

"Interest has been defined 'to be a compensation allowed to the creditor for delay of payment by the debtor,' and is said to be impliedly due 'whenever a liquidated sum of money is unjustly withheld.' 10 Wheat. 440. And again,—but rather by way of amplification,—it is said 'to be a legal and uniform rate of damages allowed in the absence of any express contract, when payment is withheld after it has become the duty of the debtor to discharge his debt.'" *Kelsey v. Murphy*, 30 Pa. 340, 341 (1858). "In all cases of contract interest is allowable at the legal rate from the time payment is withheld after it has become the duty of the debtor to make such payment; *allowance of such interest does not depend upon discretion but is a legal right.* . . . It is a right which arises upon breach or discontinuance of the contract provided the damages are then ascertained by computation and even though a bona fide dispute exists as to the amount of the indebtedness. . . ." (Emphasis added.) *Palmgreen v. Palmer's Garage, Inc.*, 383 Pa. 105, 108, 117 A. 2d 721, 722 (1955).

There is a limitation upon these general rules, however, when a case involves the Commonwealth, because "a sovereign state is not liable for interest in any case except where, expressly or by reasonable construction of a contract or statute, it has placed itself in a position of liability." *Purdy Estate*, 447 Pa. 439, 442, 291 A.

---

[2] For the purpose of this opinion we will consider that interest was not in fact included in the Board's award, although no mention is made of the subject by the Board.

2d 93, 95 (1973). *See Marianelli v. General State Authority,* 354 Pa. 515, 47 A. 2d 657 (1946); *Northwestern National Bank v. Commonwealth,* 345 Pa. 192, 27 A. 2d 20 (1942).

It has thus been held by our Supreme Court that under our eminent domain laws, agencies of the Commonwealth[3] and the Commonwealth itself[4] are liable for interest in eminent domain cases. As to cases decided by the Board of Claims, there are apparently no appellate court decisions concerning payment of interest by the Commonwealth on awards made against it by the Board, but there is a Common Pleas case directly on point, *Road Machinery, Inc. v. Commonwealth,* 88 Dauph. 1 (1967). Citing *Wolf, supra,* that court decided that the Commonwealth is obligated to pay interest on awards made by the Board. The court stated:

"Directly concerned here is the extent of the authority of the Board of Arbitration of Claims. The Board was created by the Act of May 20, 1937, P. L. 728, 72 P.S. 4651-1 et seq. The Commonwealth of Pennsylvania is a sovereign state, and as such it cannot be sued except with its consent. The creation of the Board of Arbitration of Claims provided a comprehensive plan to arbitrate claims against the Commonwealth arising from contracts entered into by the Commonwealth. As stated in Foley Bros., Inc. v. Commonwealth, Appellant, 400 Pa. 584 (1960) at page 590: '. . . the Act of 1937 is a self-contained Act created expressly for the disposition of claims against the Commonwealth, which can be sued only when and how it permits.' By authorizing unlimited awards against the Commonwealth, the Legislature appears to have included the right to award interest.

---

[3] *Lichtenstein v. Pennsylvania Turnpike Commission,* 398 Pa. 415, 158 A. 2d 461 (1959).

[4] *Wolf v. Commonwealth,* 403 Pa. 499, 170 A. 2d 557 (1961).

"Initially, the statute provided in Section 8 that, 'The action of the Board dismissing such claim or making an award shall be final and no appeal shall lie therefrom.' The statute further provided for prompt payment of the award. By the Act of September 29, 1961, P. L. 1738, 72 P.S. 4651-8, Section 8 was amended to eliminate the finality described above by permitting an appeal to the Court of Common Pleas of Dauphin County [appeals are now taken to the Commonwealth Court]. In view of the appeal provision, substantial delays may now be encountered after the award and before payment. Inherent in the broad powers given to the Board of Arbitration of Claims to resolve contractual disputes involving the Commonwealth, must exist the power to award interest. And, particularly since the 1961 amendment, when payment of the award may be delayed by an appeal, common fairness requires that interest continue to run until the award is satisfied." 88 Dauph. at 5-6.

We must agree with the reasoning of the court in *Road Machinery, supra,* and hold that the Commonwealth is required to pay interest on awards made by the Board. And, because a reasonable construction of the applicable statute indicates the Commonwealth is liable for interest, it is reasonable also to hold that, as in *Palmgreen, supra,* such interest is a legal right and should run from the date on which the Commonwealth's obligation as to rent to the Bergers arose.

For the above reasons, therefore, we issue the following

## ORDER

Now, November 20, 1973, we affirm the order of the Board of Arbitration of Claims but remand the record to the Board for the computation and award of the interest payable at 6% per annum, due to the Bergers.