**DIVERSIFIED ENVIRONMENTS, INC., Plaintiff,**

v.

**OLIVETTI CORPORATION OF AMERICA, Defendant.**

**Civ. A. No. 76–442.**

United States District Court, M. D. Pennsylvania.

Dec. 4, 1978.

---

Friedman & Friedman, P. C., John C. Howett, Jr., Charles E. Friedman, Harrisburg, Pa., for plaintiff.

William E. Miller, Jr., Harrisburg, Pa., for defendant.

## MEMORANDUM

HERMAN, District Judge.

This is an action for damages brought by a lessee of a computerized accounting system manufactured and sold by the Defendant, Olivetti Corporation of America (Olivetti). Plaintiff, Diversified Environments, Inc., (Diversified) alleges that the Olivetti computer that it leased has never been made operational and that Defendant is liable for damages on theories of breach of contract, misrepresentation and breach of express and implied warranties. Olivetti defends on the basis that it has fully performed and alternatively that it was excused from performance because Diversified unreasonably refused to permit it to effectuate its contractual duties. Plaintiff seeks relief for the total payments made under the lease agreement for the computer, the cost of paper products, and other consequential damages. The following are the Court's findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff, Diversified Environments, Inc., is a Pennsylvania corporation engaged in the selling of temperature and energy control systems with its principal place of business at Camp Hill, Pennsylvania.

2. Defendant, Olivetti Corporation of America, is a Delaware corporation engaged in the business of selling computer services with local business offices in Harrisburg, Pennsylvania.

3. Jurisdiction is based upon diversity of citizenship and an amount in controversy in excess of ten thousand dollars.

4. In July of 1974, Tim L. Fleegal, a sales representative of Olivetti contacted Diversified's President, Charles E. Andiorio, Jr., for the purpose of inducing him to buy or lease a computerized accounting system.

5. Mr. Andiorio subsequently met with Mr. Fleegal and explained in detail the nature of Diversified's business and particularly noted that the most tedious part of his duties was the preparation of specifications to be used in submitting bids on jobs.

6. Mr. Fleegal also met with Mr. Warren Beck, who was primarily responsible for the Plaintiff's accounting system, during July and Mr. Fleegal was made aware of all of the accounting procedures of Diversified and that Diversified's accounting records had to be compatible with Barber-Colman Co., for whom Diversified was a manufacturing representative.

7. Neither Mr. Beck nor Mr. Andiorio were familiar with computer systems and they relied upon Mr. Fleegal's expertise.

8. After Mr. Fleegal became thoroughly familiar with the operations of Plaintiff's business he stated that the Olivetti P–603 Computer System would meet all of the Plaintiff's requirements and perform all of the functions that were discussed.

9. Mr. Fleegal was only qualified to sell the P–603 Computer System, which was an accounting computer, and not the Olivetti word processing machines.

10. At the time of the discussions, Mr. Fleegal stated to both Mr. Beck and Mr. Andiorio that utilization of the P–603 Computer System would save the Plaintiff both time and expense by reducing manpower and record keeping.

11. Mr. Fleegal represented to Mr. Andiorio that he would only need to push a button and he would have the specifications, that Mr. Andiorio would save half of his time, and that the computer would enable Diversified to do without one of its secretaries.

12. On July 26, 1974, Mr. Fleegal submitted a proposal to Mr. Andiorio and advised that the P–603 accounting computer could effectively meet all of the objectives discussed between the parties.

13. The proposal specifically set forth that the P–603 computer could perform the

functions of specification writing, estimating, accounts payable, job cost, prime cost analysis, accounts receivable and check writing.

14. The proposal stated that the total cost of the system was $9,590.00 which included all programming, forms design, initial operator training, delivery and installation of equipment.

15. It further provided:

"in dealing with Olivetti you do business with a firm which herein guarantees in writing the exact performance of the system both machine and program. Only after these assurances have been met can we ship the machine and bill you as a customer. In addition you have my personal assurance and that of the Harrisburg District Management that all of our resources will be employed toward your complete satisfaction in the system."

16. During July or August of 1974, parts of the proposed computer package were demonstrated to Mr. Beck in the Defendant's office, however, at no time were either the specification writing or estimating demonstrated.

17. On August 7, 1974 Mr. Beck signed in two places, on behalf of Diversified, a "Customer Software Acceptance" form provided by Mr. Fleegal.

18. The Customer Software Acceptance form contains three places for signatures and Mr. Beck signed his name after the following statements on the form:

"1. I agree that the system explained to me with regard to this application is correct in all respects and that any alterations after this date could result in additional charges according to the current published program rates.

2. This application as described in section 1 has been demonstrated to me in its final programmed form and I accept it as being a complete and workable solution."

19. Mr. Beck did not sign after the third line which stated:

"The program described in section 2 above has now been installed and the relevant personnel have been fully advised of its capabilities. I have received complete program documentation."

20. Mr. Fleegal advised Mr. Beck that Diversified would owe absolutely no financial obligation until the third line of the form was signed and it was this promise that actually prompted Mr. Beck to sign the first two lines of the form.

21. This "Customer Software Acceptance" form was considered by the defendant as an agreement or contract between the parties.

22. After the signing of the form, the computer and various programs were ordered by Mr. Fleegal.

23. Around this same period of time, in July or August of 1974, Mr. Fleegal also assured Mr. Andiorio that Diversified would not be bound to accept the computer unless and until a third signature was placed on the acceptance form as acceptance and approval of the complete system.

24. Mr. Fleegal promised to personally oversee the installation and implementation of the complete computer system and also promised that Plaintiff's operators would be fully trained and if the training proved unsuccessful that Olivetti girls would be available to run the computer.

25. Mr. Fleegal also promised both Mr. Beck and Mr. Andiorio that either he or other Olivetti staff would transfer all the necessary information onto the computer cards and the Plaintiff's only obligation was to show the Olivetti staff where the information that was needed as a data base was stored.

26. Along with the other representations, Mr. Fleegal told Mr. Andiorio that Plaintiff would not owe one cent until the computer was fully in operation and they were completely satisfied.

27. On these conditions, the computer was placed at Plaintiff's business during September of 1974, however, it was not operational at that time.

28. Mr. Fleegal then contacted an equipment leasing company, Equipment Funding, Inc., (Equipment Funding) and made

the arrangements for Equipment Funding's purchase of the computer and software, and the subsequent leasing of it to the Plaintiff.

29. Mr. Fleegal received a lease agreement from Equipment Funding and took it to Mr. Beck for his signature on October 3, 1975.

30. Mr. Beck signed the lease agreement on October 3, 1975 after Mr. Fleegal assured him that it was just a mere formality, an application for a lease, and that Plaintiff would not be obligated to keep the system or to make any payments until it was completely satisfied.

31. Subsequently, Mr. Beck received a payment or coupon book from Equipment Funding and on approaching Mr. Fleegal, he was told to disregard it as no payments were due until the computer was operative and until they signed the third line of the Software Acceptance form as their acceptance.

32. The lease was not to be effective until an "Acceptance Certificate" was signed by the Plaintiff.

33. In mid-November, Mr. O'Brien, from Equipment Funding, and Mr. Fleegal went to Plaintiff's place of business for the purpose of obtaining execution of the "Acceptance Certificate" and Mr. Beck initially refused to sign the certificate.

34. Mr. Fleegal then induced Mr. Beck to sign the acceptance on the promises that the computer would be running by the first of the year and on the guarantee that the computer system would be acceptable to the Plaintiff.

35. Subsequently, Mr. Fleegal and another Olivetti employee, Barbara Slagle, made several visits to Diversified for the purpose of installation.

35. Mrs. Slagle, a customer software representative, met with Plaintiff's employee on December 18, 1974 and together they set up the payroll data base and the employee was taught how to update the data.

36. The payroll function was the only function Mrs. Slagle was supposed to teach as Mr. Fleegal was to teach all of the other functions listed in the proposal.

37. Mrs. Slagle incurred no problems in either teaching Plaintiff's employee or in getting the base data for the payroll function.

38. Mr. Fleegal made several visits during the month of December, 1974 for the purpose of training Plaintiff's employee on the numerous other functions, however, he neither transferred the data as previously promised nor was he successful in training the designated employee on any of the other functions.

39. Mr. Fleegal spent a substantial amount of his time during these visits in discussing his religious beliefs with Plaintiff's employees.

40. After receiving complaints from his employees, Mr. Andiorio refused to allow Mr. Fleegal to return to the premises.

41. During Mr. Fleegal's visits at Plaintiff's business in December of 1975, he never requested any information from Mr. Andiorio with respect to the specification writing or estimating even though the specification writing was to be the primary use of the computer.

42. By January 7, 1975 the only data that had been transferred was the payroll base data and the computer was only capable of being utilized for this minor function at that time.

43. Plaintiff, pursuant to prior representations, in early January, stopped further training and requested the Defendant to remove the computer from their premises as the computer was at that time nearly worthless because data had not been transferred, employees had not been trained, and because Plaintiff was completely unsatisfied with the computer.

44. Defendant refused to remove the machine and by letter of January 20, 1975 District Manager, T. F. Meade, Jr., replied, "The relevant personnel have been trained" and "[o]ur only remaining obligation is to continue to assist you in the fullest implementation of this system which you requested and for which you contracted."

45. Plaintiff continued making the lease payments after consulting with counsel as it did not want to place its credit rating in jeopardy and was advised to institute suit against Olivetti instead.

46. A meeting was subsequently held in February, 1975 with Mr. Meade, Mr. O'Brien, Mr. Andiorio and others in attendance, and Defendant took the position that it had fully performed.

47. No further training was conducted in 1975 and Defendant was not requested by Plaintiff to conduct training during this period.

48. This suit was then filed on April 13, 1976.

49. Subsequent to the institution of this action, Mrs. Slagle returned in December of 1976 to train another employee and to attempt to prepare the computer for Plaintiff's utilization.

50. After one day or a day and one-half this installation attempt was rejected by the Plaintiff on the advice of his employee who was trained in computer systems for the reasons that the P–603 was not compatible with the Barber-Colman bookkeeping system and because use of the accounting computer for specification writing was cost prohibitive.

51. Use of the P–603 computer for specification writing required that the information be placed on cards at the rate of one paragraph per card, which for Plaintiff's needs would have required likely over a thousand cards at two dollars each, and which would have required someone manually to pick the necessary cards out of a file and insert them into the P–603 computer.

52. The P–603 computer was not designed to perform word processing as that required for specifications writing, which was the Plaintiff's primary concern.

53. Expenses incurred by Plaintiff with respect to this transaction include $15,-126.00 for payments due under the lease, $145.54 for paper products, and an accountant's bill of $387.50.

## DISCUSSION

While a number of the theories raised by the Plaintiff are indeed relevant and applicable to the facts of this case, it is unnecessary to discuss the theories of warranty and misrepresentation as Defendant's breach of its contractual duties is sufficient to impose liability. The parol evidence rule is clearly inapplicable here as there was no integrated written agreement between the parties that fully and completely stated the entire agreement. See, *Yuhas v. Schmidt*, 434 Pa. 447, 258 A.2d 616 (1969); *Carl Beasley Ford, Inc. v. Burroughs Corp.*, 361 F.Supp. 325 (E.D.Pa.1973). The only writings involved are the written proposal and the Customer Software Acceptance form, neither of which completely embody the agreement between the parties. We find that the oral agreement to provide certain services formed part of the contractual relationship and that the oral agreement obligated Defendant to perform the transfer of data, the training of employees, and generally to make the computer functional. These obligations were breached as the base data has only been transferred for the relatively minor payroll function and the only training that has been completed is to this payroll function. Plaintiff's employees have not been trained on the remaining functions, the ones most important to the Plaintiff, and the base data has never been transferred onto the computer cards.

Defendant asserts that it should be excused from performance because the Plaintiff prevented it from performing its obligation. While not totally devoid of merit, this argument fails to relieve the Defendant from liability. As noted in the findings, the computer was installed at Plaintiff's place of business in September of 1974 and the Plaintiff was fully receptive to having the computer made operational until sometime in early January of 1975. Plaintiff assigned an employee for the computer training and Mrs. Slagle encountered no problems in either the training or the transfer of data for the payroll function. The problems arose from Mr. Fleegal's failure to succeed in training the employees on the

other numerous functions and failure to transfer the base data as was initially promised, and which formed a part of the understanding between the parties. This could have been due to the fact that this was Mr. Fleegal's first sale and his first attempt at training individuals in the use of the computer. Regardless of this, it is clear that no one was trained to perform the other functions and that Mr. Fleegal interfered with Plaintiff's employees to some extent with his religious discussions.

It was only after Defendant's attempts at performance were proving unsuccessful that Plaintiff demanded the computer be removed and training halted. This was reasonable under the circumstances as Defendant had advised Plaintiff numerous times that it had no financial or contractual obligation until they signed the third line of the Customer Software Acceptance form as an indication that they were completely satisfied and that the computer was fully operational. As noted above, the Defendant took the position that it had performed and that the employee of Plaintiff had been trained, which was simply not true. The Plaintiff remained receptive to having its employees trained, even after suit was filed, until it determined that the computer was neither economically feasible nor compatible with other bookkeeping requirements. In short, Plaintiff's refusal to permit training at the two times noted was reasonable under the circumstances and was not a material interference with Defendant's obligation. The argument that it was excused because base data was not supplied is similarly unpersuasive as Mrs. Slagle encountered no such problem, Mr. Fleegal never advised Mr. Andiorio of any uncooperative conduct of his employees, and because the letter of Mr. Meade of January 1975 never raised the problem of obtaining base data. Therefore, no excuse exists for Defendant's non-performance. See, *Rainier v. Champion Container Co.*, 294 F.2d 96, 103 (3d Cir. 1961); *Commonwealth v. Berger*, 11 Pa.Cmwlth. 332, 342–43, 312 A.2d 100 (1973).

██ Defendant also argues that Plaintiff has failed to join an indispensable party,

Equipment Funding, because complete relief cannot be accorded among those already parties. This argument is not valid for at least two reasons. First, complete relief can be accorded between the present parties. Defendant breached its contractual obligation and defendant has made no showing that Equipment Funding is an indispensable party. Second, the Defendant should be estopped from even raising the issue as it was only due to Defendant's misrepresentation that the lease was initially entered and the acceptance certificate signed.

██ The final argument of the Defendant is that Plaintiff failed to mitigate its damages. While Plaintiff was under an obligation to mitigate damages, it was Defendant's burden to prove that Plaintiff failed in this obligation. *Carl Beasley Ford, Inc. v. Burroughs Corp.*, 361 F.Supp. 325, 335 (E.D.Pa.1973); *Watsontown Brick Co. v. Hercules Powder Co.*, 265 F.Supp. 268 (M.D.Pa.1967). Defendant did not present any facts at trial that established a means of mitigation for the Plaintiff. Instead, the evidence showed that Plaintiff tried to return the computer and that after this was rejected by the Defendant, Plaintiff gave Defendant other opportunities to perform its contractual duties. The breach was material and the measure of damages is that which was caused by the breach. *Carl Beasley Ford, Inc. v. Burroughs Corp.*, 361 F.Supp. 325 (E.D.Pa.1973). Under the circumstances of this case, the damages are the cost of the computer and paper products, the interest that Plaintiff was obligated to pay under the lease, and the expense incurred for an accountant on the request of Defendant's agent, totalling $15,659.04.

CONCLUSIONS OF LAW

1. A contractual relationship exists between Diversified and Olivetti, part of which is the oral agreement by Olivetti to perform the transfer of all base data and to train Plaintiff's employees.

2. The contractual duty owed to the Plaintiff was breached by the defendant as Defendant substantially failed to carry out

its obligations of transferring the base data, of training Plaintiff's employees, and of making the computer system operational.

3. The injury suffered by the Plaintiff due to Defendant's breach is $15,659.04 and judgment will be entered for the Plaintiff in this amount.

An appropriate order will be entered.