**MARINE TRANSPORT LINES, INC., the Dow Chemical Company, Libellants,**

v.

**PUBLICKER INTERNATIONAL, INC., Respondent.**

**No. 19 of 1964.**

United States District Court
E. D. Pennsylvania.

March 4, 1969.

Rawle & Henderson, Richard W. Palmer, Philadelphia, Pa., for libellants.

Krusen, Evans and Byrne, Mark D. Alspach, Philadelphia, Pa., for respondent.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW

WEINER, District Judge.

After a trial before the Court without a jury, in a maritime action against the respondent, charterer, seeking to recover demurrage and extra expenses predicated upon an allegation that the charterer unreasonably delayed the loading of the libellant's vessel for a period of approximately ten (10) days, the Court makes the following:

## FINDINGS OF FACT

1. On October 22, 1963, Marine Transport Lines, Inc., acting for The Dow Chemical Company, libellant, and Publicker International, Inc., respondent, entered into a tanker voyage charter party for the steamship Leland I. Doan.

2. Charterer had actual notice, before the tendering of the vessel, that the Leland I. Doan had recently carried styrene.

3. The charter party provided that the cargo would be 11,500 long tons "high specification industrial ethyl alcohol".

4. The charter party further provided that the cleaning of pumps, pipelines and compartments for this cargo was to be cleaned to charterer's inspector's satisfaction. (Either Chas. Martin or Saybolt).

5. Chas. Martin was selected as the charterer's inspector.

6. The vessel arrived in the Port of Philadelphia on November 4, 1963.

7. When the vessel arrived in Philadelphia, the charterer's inspector boarded the vessel and inspected the tanks which were to carry the cargo.

8. Upon inspection tanks 1A and B, 3A and B, 4A and B, and 9A and B, were rejected as being unfit to carry the designated cargo because of an odor of styrene.

9. The presence of styrene in the tanks of the carrier would contaminate and destroy the marketability of the cargo of industrial ethyl alcohol.

10. The rejection of the tanks by the charterers' inspector continued until November 13, 1963.

11. The cargo was ultimately loaded aboard the vessel on November 13 and 14, 1963, and the vessel sailed for Germany.

12. The cargo outturned in good condition at its destination and was accepted without reservation by the receivers.

13. The inspector's rejection of the tanks was genuine and not made in bad faith nor was it capricious.

14. The libellant has failed to meet the burden of proof placed upon it to establish by precise, clear and indubitable testimony that the type and grade of the cargo to be carried by it was not accurately disclosed.

15. The delay in the loading of the vessel cannot be attributed to either the charterer's inspector or the respondent.

## DISCUSSION

It is undisputed that this contract was made in New York and that performance of the contract was to be fulfilled in Pennsylvania. Preliminarily, therefore, we must consider and determine a conflict-of-laws question. Initially, as this action was instituted in this district, the conflict law of Pennsylvania is applicable. Cf. Klaxon Co. v. Stentor Electric Manufacturing Co., Inc., 313 U. S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Applying this standard we find that New York law governs the nature, construction and validity of the contract whereas Pennsylvania law controls the

performance of the contract since it was to be performed in Pennsylvania. Electrosonics International, Inc. v. Wurlitzer Company, 234 F.Supp. 913 (E.D.Pa. 1964); Tow v. Miners Memorial Hospital Ass'n, Inc., 305 F.2d 73 (4th Cir. 1962). The measure of performance was specifically written into the contract and provided that the vessel was to be loaded in Philadelphia on the date of its arrival and was to transport ethyl industrial alcohol in tanks that were to be cleaned to the satisfaction of the charterer's inspector.

■ In examining the law of Pennsylvania as it relates to an interpretation of the legal significance to be attached to a clause in a contract providing for performance by one party to the satisfaction of another, we agree with the view expressed by the Pennsylvania Supreme Court in Jenkins Towel Service, Inc. v. Tidewater Oil Company, 422 Pa. 601, 606, 223 A.2d 84, 86 (1966):

"Such contracts are not strangers to the law of Pennsylvania and have been considered by us on numerous previous occasions. We have consistently held that where a contract provides for performance by one party to the satisfaction of the other, the test of adequate performance is not whether the person for whom the service was rendered ought to be satisfied, but whether he is satisfied, there being, however, this limitation, that any dissatisfaction on his part must be genuine and not prompted by caprice or bad faith."

To establish caprice or bad faith, the libellant relies upon the testimony of its witnesses who in substance stated:

(a) That the tanks had been cleaned in accordance with the applicable cleaning methods;

(b) That after cleaning, the tanks were fit to carry liquids to be ultimately used for human consumption;

(c) That the charterer's inspector negligently performed his job in that he failed to properly conduct his tests and that he applied improper standards to determine the cleanliness of the vessel's tanks;

(d) Charterer's misrepresentation of the identity of the cargo to be carried.[1]

The respondent introduced the evidence of the charterer's inspector. He stated that upon examining the tanks he detected a strong odor of styrene.[2] In minute detail he related the tests he adopted to inspect the tanks [3] which were the standard tests made for the carriage of alcohol [4] and finally did certify, on November 13, that tanks passed inspection.[5] He stated that the odor of styrene would have contaminated the

1. The relevant testimony of Captain William G. White is as follows:

Q. Now, what information did you get as to the identity of the September cargo carried from California to Philadelphia?

A. The September cargo was represented to us as grape alcohol that was to be further processed in Philadelphia.

Q. Now, what information, if any, did you get as to the October cargo, Philadelphia to Germany?

A. It was represented to be the same cargo as we transported from the West Coast. N.T. January 7, 1969, p. 27.

The September cargo was carried by the libellant for the respondent. The October cargo is that which is the subject matter of this action.

Ferman T. Ainsworth, an employee of The Dow Chemical Company, testimony is as follows:

Q. What connection if any does the grade of alcohol carried on the October charter have to do with your approval?

A. The basic connection it has is that we were advised that it was the same cargo * * * carried on the September charter. N.T. January 9, 1969, p. 163.

2. N.T. January 16, 1969, p. 47.

3. Id. pp. 48, 49, 53, 54.

4. Id. p. 49.

5. Id. p. 62.

cargo.[6] Corroboration of the presence of the odor of styrene was furnished by the testimony of Captain Robert Paul McKeever.[7]

We must determine, in the light of this conflicting testimony, whether the inspector's rejection of the cleanliness of the ship's tanks for the purpose of carrying the specified cargo was genuine and not prompted by caprice or bad faith.

 Our perusal of the testimony, coupled with our observation of the witnesses on the witness stand has persuaded us that the acts of the inspector were genuine and were not committed as the result of caprice or bad faith. The libellant cannot succeed by merely proving that the decision of the inspector did not meet with its appraisal of the cleanliness of the tanks.

The libellant also advances as a cause of action a failure of disclosure by the respondent. It is averred that the identity of the cargo of alcohol was represented to it as being destined for commercial use, whereas in fact, the cargo presented to it for loading was to be used for human consumption. Libellant further contends that it was in reliance of the respondent's representation that it entered into the present cleaning clause and claims that there is a direct and unequivocal connection between the form of a cleaning clause and the grade of the cargo to be carried. We will elaborate somewhat on this contention.

Clause 16 of the standard printed charter party agreement executed by the parties provided that the tanks were to be cleaned to the reasonable satisfaction of the charterer's inspector. It also granted to the owner the option to either perform further cleaning or to withdraw the vessel from service in the event the charterer or its inspector required fur-

ther cleaning. It is undisputed that this clause was eliminated and the present typewritten clause substituted in its stead. From this circumstance, the libellant contends that if the grade of the cargo had been accurately disclosed as beverage alcohol before the signing of the charter, the standard cleaning clause would have been required by the vessel and the charter would not have been executed with the unqualified clause ultimately typed. With equal vehemence, the respondent denied that it or its representatives ever informed the libellant's agents that the cargo was the same as that previously transported by the libellant's vessel from the West Coast.

Captain McKeever testified that he informed the libellant that the respondent was looking for a ship with the capacity to carry cargo that he identified as high specification industrial ethyl alcohol. He then gave the following evidence:

> Q. Am I correct in understanding, Captain McKeever, that the discussions and conversations you had relating to this transaction were either with Mr. Ainsworth, Captain White, Mr. Sapp or Mr. Terry Reese? Does that include all of them?
>
> A. Yes, very briefly with Captain White.
>
> Q. Now, at anytime before the ship arrived in Philadelphia did any of them raise any question about the nature or characteristics of the cargo covered by the charter party?
>
> A. No.
>
> Q. Did you ever say to any of these individuals named a minute ago, with whom you conversed, that the cargo to be carried on the Doan from Philadelphia under

---

6. Q. How would that odor that you found there affect the ship's cleanliness to carry high-specification industrial ethyl alcohol?
A. Had they loaded alcohol in those tanks at that time, the odor would have stayed in the alcohol. Instead of having

a natural alcohol odor, it would have had the odor of styrene.
Q. Would that be a contaminant of the cargo?
A. It certainly would.

7. Id. p. 97.

this October 22 charter was the same cargo that the Doan had carried from California in September of that year?

A. No.[8]

Karl R. Kurz was then examined and testified that he concluded the negotiations for the charter with the libellant. He also denied that he told the libellant that the cargo to be carried was a similar cargo to that which had been carried by the Doan in September, 1963.[9] Kurz and Captain McKeever both testified that the nature of the cargo was the sole cause of substituting the existing full cleaning clause for the standard type qualified one. In addition Captain McKeever unequivocally stated that he gave the specifications for the alcohol to the libellant and cautioned that it was a difficult problem to handle and therefore the specifications were very high and very tight.[10] We have before us a voluminous record, upon a study of which, and after an opportunity to see and observe the witnesses as they testified, directs us to the conclusion that the facts related to by the respondent are to be accepted as more creditable than those relied upon by the libellant.

■ The libellant appears to rely on the case of Swan v. Five Hundred and Fifty Tons Reserve Coal, 35 F. 307 (S.D. N.Y.1888) to support its position. In *Swan* the charter agreement provided for a "cargo of coal". The court found that the charterer intended to ship a cargo of "culm" coal which fact was not disclosed to the libellant. The court held that under a general charter for a "cargo of coal" charterers were not entitled to subject the ship to the delays incident to loading a special kind of selected coal and the owner of the vessel was entitled to recover demurrage charges. This court, however, is of the opinion that *Swan* is distinguishable from the instant action for the following reasons:

(a) We have decided that the charter obligated the vessel to carry industrial ethyl alcohol and the cargo presented for loading was as represented and not a substituted or special kind of selected cargo.

(b) That it was the duty of the libellant to furnish tanks that were cleaned to the satisfaction of the charterer's inspector.

■ We were also influenced by the failure of the libellant to meet its burden of establishing its premise of misrepresentation through precise, clear and indubitable testimony. A mere preponderence of evidence is insufficient. Laughlin v. McConnel, 201 Pa.Super. 180, 191 A.2d 921 (1963).

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this case.

2. Publicker International, Inc. did not breach the Tanker Voyage Charter Party.

3. Publicker International, Inc. is not responsible for any delay in the loading of the steamship Leland I. Doan.

---

8. N.T. January 14, 1969, pp. 67–89.

