**NOHCRA COMMUNICATIONS, INC.,**
**Plaintiff–Appellee,**

v.

**AM COMMUNICATIONS, INC.,**
**Defendant–Appellant.**

**No. 89–2543.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 22, 1990.

Decided Aug. 6, 1990.

Rehearing Denied Oct. 25, 1990.

Charles J. Pesek, Karaganis & Gold, Oak Brook, Ill., for plaintiff-appellee.

James M. Mulcahy, Michael Dockterman, Jill A. Pieper, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendant-appellant.

Before CUDAHY and COFFEY, Circuit Judges, and SHARP, Chief District Judge.[1]

ALLEN SHARP, Chief District Judge.

This action involves the breach of a contract to dig ditches, rather sophisticated ditches that constitute an underground cable television system. The plaintiff in this action, Nohcra Communications, Inc. (Nohcra) entered into a subcontract agreement with defendant, AM Communications, Inc. (AM) to install cable television equipment. Several Chicago suburbs had franchised with Warner Amex Cable Communications, Inc. (Warner Amex) to bring cable television to the residents of Buffalo Grove, Elk Grove Village, Hoffman Estates, Palatine and Rolling Meadows. Warner Amex sought bids from various contractors to serve as general contractor for the entire

---

1. The Honorable Allen Sharp, Chief Judge, United States District Court for the Northern District of Indiana, sitting by designation.

project. AM was the successful bidder. As general contractor, AM hired Nohcra (along with other subcontractors) to perform the cable installation. Nohcra was assigned underground (as opposed to aerial) cable work.

Nohcra's subcontract is an elaborate agreement containing several schedules that specify what (and when) work is to be completed, to what specifications, and for what price. The agreement is dated March 26, 1982, and provides that its provisions are to be performed and construed according to the laws of the Commonwealth of Pennsylvania.[2] Nohcra commenced its work in mid-April. On July 9, 1982, AM orally notified Nohcra it was terminating their agreement. Three days later AM indicated in writing four reasons for the termination: (1) Nohcra failed to construct the required ten thousand feet per day; (2) Nohcra failed to install cable in continuity; (3) Nohcra generated excessive homeowner complaints; and (4) Nohcra lacked experienced personnel.

On August 25, 1982, after AM had failed to pay the vast majority of Nohcra's invoices, Nohcra filed a five-count complaint against AM alleging breach of contract. Counts I, II and III seek compensation for work performed prior to the termination. Counts IV and V request lost profits resulting from the termination. In January 1983 AM filed a counterclaim against Nohcra and its president for breach of contract. AM asks for recovery of moneys spent by AM to repair Nohcra's faulty work and for damages due to Nohcra's fraudulent misrepresentations in negotiating the subcontract.

Following a bifurcated bench trial on the issues of liability and damages, the district court found for Nohcra and awarded compensatory damages (for work performed and lost profits) and prejudgment interest. The court dismissed AM's counterclaim, holding that AM had failed to prove any material misrepresentation. The district

court's jurisdiction was based on diversity of citizenship under 28 U.S.C. § 1332.

AM appeals, presenting five issues for our review: two relate to liability; two to damages; and one to the dismissal of the counterclaim.

## I. LIABILITY PHASE

### A.

The district court heard testimony in the liability phase of the trial that spanned six days. After reviewing the evidence, the district court held that AM's failure to pay Nohcra's invoices constituted a material breach of the subcontract agreement. Findings of Fact and Conclusions of Law (Findings) at 6. On appeal, AM argues that, in an action for breach of contract (as opposed to quantum meruit), the plaintiff is required to prove more than the mere performance of some work without being paid. Rather, Nohcra must prove it performed all of its contractual obligations. *Girard Bank v. John Hancock Mutual Life Ins. Co.*, 524 F.Supp. 884, 891 (E.D.Pa. 1981), *aff'd*, 688 F.2d 820 (3d Cir.1982), *citing Mellon Bank, N.A. v. Aetna Business Credit*, 619 F.2d 1001, 1007–08 (3d Cir. 1980); 5A *Corbin on Contracts* § 1228, at 507–08 (1964).

AM characterizes Nohcra's duties under the contract as furnishing all labor, tools, equipment, and necessary experience and personnel to produce a continuous and usable portion of the Warner Amex system to the satisfaction of AM, in a timely manner, and in accordance with the contract's specifications. AM insists Nohcra did not perform any of these obligations. Appellant's Brief at 14.

The district court found that Nohcra had performed its obligations in a commercially reasonable and acceptable manner. Findings at 6. Addressing AM's reasons for termination, the court held that (1) Nohcra did not construct ten thousand feet per day because it was not assigned enough work to sustain that rate of production; also,

**2.** Where AM has its principal place of business. Because the contract so specifies, and neither party has argued to the contrary on appeal, Pennsylvania law governs the contract's construction and enforcement.

Nohcra encountered delays in obtaining utility locates and design maps that were entirely beyond its control; (2) Nohcra was not responsible for lack of continuity because it performed its work in accordance with assignments from Warner Amex and AM; also, delays in obtaining design prints and utility locates precluded Nohcra's installation of cable in continuous runs; (3) although Nohcra generated some homeowner complaints, which is to be expected when installing underground cable systems, there was not an excessive number of complaints; and (4) AM failed to prove that Nohcra misrepresented its experience. AM challenges these findings and asks us to reverse the district court's judgment.

Rule 52(a) of the Federal Rules of Civil Procedure provides the pertinent standard of review: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." A finding is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (citations omitted). Speaking for the Court in *Anderson*, Justice White continued:

> This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court.... If the district court's account of the evidence is plausible in light of the record reviewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's

choice between them cannot be clearly erroneous (citations omitted).

*Id.* at 573–74, 105 S.Ct. at 1511–12; *see also Graphic Sales, Inc. v. Sperry Univac Div.*, 824 F.2d 576, 580 (7th Cir.1987). We note that in no way does the majority opinion in *Anderson*, or the concurring opinions of Justices Powell and Blackmun, diminish the important obligation of federal appellate courts to engage in a comprehensive review of the entire record.

The district court heard testimony from Nohcra's president and project supervisor. The two gentlemen testified, and the court agreed, that Nohcra's production rate was less than the contract specified because AM did not assign Nohcra enough work to meet its output requirement. Liability Trans. at 81–82; 254. This problem stemmed in large part from the utility companies' failure to provide AM (or Nohcra) with necessary information on underground utility locations. Liability Trans. at 84–85; 239–44. It also explains why Nohcra was unable to perform continuous production runs—Nohcra could dig only where it had been cleared to dig.

The district court also found that, although Nohcra generated some homeowner complaints, there was not an excessive or unusually high number of complaints. Findings at 6. AM argues that much of the property destruction occurred because Nohcra failed to provide an experienced site supervisor required by paragraph 7(B) of their agreement.[3] Robert Kampf, Nohcra's project supervisor, was acknowledged even by AM personnel as experienced and possessing technical expertise. Liability Trans. at 765–66. Although there was conflicting testimony regarding the amount of time Kampf actually spent supervising the cable-tv installation, the district court chose to credit Kampf's testimony that he spent 12–13 hours per day on the Nohcra project. Liability Trans. at 218. We cannot conclude, as AM urges, that the district court's finding in this regard was clearly erroneous. Nor did the court commit clear error by finding that Nohcra did not generate an

---

**3.** Paragraph 7(B) requires that "[Nohcra] will furnish competent CATV construction site su-

pervisor who will supervise construction of the CATV system."

excessive number of homeowner complaints. Liability Trans. at 67; 93–94; 236. There was corroborating evidence to this effect from AM officials. Deposition of Jerold Evans, 1/18/87, at 25–26. The district court's view of this evidence is reasonable and permissible. Because we are not "left with the definite and firm conviction that a mistake has been committed," *Anderson*, 470 U.S. at 573, 105 S.Ct. at 1511, we affirm this portion of the district court's judgment.

### B.

AM also alleges error in the district court's conclusion that termination of the contract was unjustified. AM argues it acted within its contractual rights by terminating the agreement pursuant to paragraph 17. Paragraph 17(A) of the contract provides in relevant part:

> Anything herein to the contrary notwithstanding, all work performed by [Nohcra] shall be to the satisfaction of [AM]. If [AM] shall be of the good faith opinion that [Nohcra] is not properly performing the work in accordance with the terms of this Subcontract, or is delaying other subcontractors ..., or is not adhering to the Progress Schedule, then [Nohcra], upon written notice from [AM], shall be deemed to be in breach of this Subcontract....

■ Under the law of "satisfaction" contracts, the party for whom performance is rendered may reject if his dissatisfaction is genuine. There is no objective standard. The relevant inquiry is not whether he ought to have been satisfied, but whether he was satisfied. There is, however, one limitation. The dissatisfaction must be sincere and not prompted by caprice or bad faith. *Jenkins Towel Service, Inc. v. Tidewater Oil Co.*, 422 Pa. 601, 223 A.2d 84, 86 (1966).

■ AM argues it was of the good-faith opinion that Nohcra's performance was un-satisfactory and, accordingly, AM exercised its privilege of termination under paragraph 17. The district court held otherwise, concluding that AM's termination was not made in good faith. Findings at 6. Although the district court characterized this finding as a conclusion of law, Pennsylvania regards it as a finding of fact. *Com. Dept. of Property and Supplies v. Berger*, 11 Pa.Cmwlth.Ct. 332, 312 A.2d 100, 105 (1973). The district court's label is not decisive. Because we hold that the court's "bad faith" holding is one of fact, not law, we proceed to review it under the "clearly erroneous" standard of Rule 52.

There was testimony, and the district court found, that at no time prior to the termination did AM notify Nohcra that its performance was inadequate.[4] Liability Trans. at 64–70; Findings at 5. Furthermore, as noted above, the court concluded that Nohcra was not responsible for its deviations from the contract requirements because of extraneous factors beyond its control. Based on these findings, the court found that AM's decision to terminate the agreement was not made in good faith. This finding is entitled to deference and may not be overturned absent clear error. Because we view this finding as plausible in light of the entire record, we affirm this portion of the district court's judgment.

## II. DAMAGES PHASE

Following the liability phase of the trial in which AM was found in breach of contract, the district court heard testimony concerning the amount of damages to which Nohcra was entitled. Nohcra claimed damages for work performed, lost profits and prejudgment interest.

### A. Work Performed

Nohcra's exhibit 1[5] consists of invoices and field reports by Nohcra employees reflecting the nature and amount of work performed and the amount due for that

---

**4.** Paragraph 17(A) also requires that AM provide fifteen (15) days written notice to Nohcra of its intention to terminate the contract because of dissatisfaction with Nohcra's performance. The district court's finding that AM failed to provide the required written notice was not clearly erroneous.

**5.** admitted during the liability phase

work. Memorandum Opinion and Order (Damages Order)[6] at 2. Based on these documents, the district court awarded damages of $172,123.62. The court found that most of these invoices and work reports were approved by AM personnel and constitute admissions that the work specified therein was performed according to the contract, and that Nohcra was entitled to payment. Damages Order at 2.[7] AM argues these invoices and work reports are inadmissible hearsay and cannot form the basis of the court's damage award.

We agree with the district judge that those field reports which AM signed and acknowledged constitute admissions[8] of work Nohcra performed according to the contract for which compensation is due.[9] However, we cannot ascertain from the district court's Damages Order whether the court excluded from the damages award those invoices which AM never acknowledged. Accordingly, we vacate and remand this portion of the court's judgment for a determination by the district judge of specifically which documents were "admitted to" by AM and for an accounting of the amount due Nohcra on such unpaid invoices.

Because AM does not argue that the district court's award of prejudgment interest is inappropriate, this judgment is affirmed. The amount of prejudgment interest is to be modified by the district court only as necessary to reflect the interest assessed on the revised "work performed" award from above.

### B. Lost Profits

■ Pennsylvania law provides that lost profits may be recovered in a contract action where (1) there is evidence that they were within the parties' contemplation at the time of contract formation and (2) the amount of lost profits can be established with reasonable certainty. *Keystone Floor Products Co. v. Beattie Mfg. Co.*, 432 F.Supp. 869, 881 (E.D.Pa.1977), *citing Taylor v. Kaufhold*, 368 Pa. 538, 84 A.2d 347 (1951).

AM appeals the district court's judgment of nearly $265,000 in lost profits, arguing that they were not contemplated by the parties, and that the award is based on pure speculation.

The district court held that future profits were contemplated by the parties because paragraph 1 of the contract (entitled "Scope of Work") assigned Nohcra a specific amount of work to perform—260 miles. Findings at 3. Paragraph 1 provides in part: "The amount or quantity of such construction work shall be that which is described and set forth in Schedule 'C'." Schedule C is a one-page progress sheet setting forth scheduled completion dates for various mileage increments up to 260 miles.

■ It is well established that, when interpreting a contract, a court must determine the intent of the parties and give effect to all relevant contractual provisions. *Com., Dep't of Transp. v. Manor Mines, Inc.*, 523 Pa. 112, 565 A.2d 428, 432 (1989). We believe the district court's finding in this regard fails to do so. The district court's meager reading of paragraph 5 (Damages Order at 5) eviscerates that provision of any meaning whatsoever, an oversight we think erroneous. Paragraph 5 (entitled "Modifications") specifies that "[AM] may, upon five (5) days written notice, require changes including modifica-

---

6. dated April 24, 1989

7. The court refused to award additional damages of almost $42,000 relating to other invoices and work reports which were not approved by AM and which were dated after Nohcra instituted its lawsuit.

8. which are not hearsay pursuant to Rule 801(d)(2) of the Federal Rules of Evidence

9. During the liability phase, Nohcra's president testified regarding his company's field reporting procedures. He explained that Nohcra crews prepared daily sheets reflecting work completed and submitted them to AM's office to be posted on a large wall map. Then AM's crew went out into the field to verify the information contained on the daily sheets. From these daily work reports, AM personnel prepared weekly reports, which they sent to Nohcra for invoicing. With the weekly reports, Nohcra then billed out its work to AM on a weekly basis. Liability Trans. at 43–44; Findings at 4–5.

tions, reductions or additions to the work." This provision suggests the parties attempted—not to guarantee Nohcra a certain level of assigned work, as the district court found, but—to indicate that Nohcra was NOT entitled to perform a predetermined amount of work since that amount was subject to change.

■ Contractual damages are intended to put the aggrieved party in as good a position as it would have been in had the contract been performed. Because of paragraph 5, full performance might have required Nohcra's satisfactory completion of all 260 miles of work, or only 26 miles of work, or some other amount altogether. Because the contract did not guarantee Nohcra a given level of work, we find that lost profits were not within the parties' contemplation. Accordingly, we reverse the district court's judgment awarding lost profits.

### III. AM'S COUNTERCLAIM

Following the institution of this lawsuit by Nohcra, AM filed a counterclaim seeking recovery of moneys it spent to repair Nohcra's faulty work and for damages arising from Nohcra's fraudulent misrepresentations in negotiating the contract. The district court dismissed the counterclaim, finding that AM had failed to prove any material misrepresentation by Nohcra. As to AM's first allegation of error, we reiterate our approval of the district court's finding that "Nohcra performed the work it was assigned in a commercially reasonable and acceptable manner." Findings at 6. As we indicated above (section I.A.), it was not clear error for the district court to conclude that Nohcra did not generate an excessive number of homeowner complaints.

■ AM also argues the district court improperly found the evidence inadequate to support its claim against Nohcra of fraudulent misrepresentation. We disagree with AM's position and hold that the district court's dismissal was sufficiently supported by the record.

By way of background, the testimony revealed that Nohcra's president, Julio Loizzo, was also an officer in a sister company called Archon Construction (Archon),[10] both companies owned by Loizzo's wife and her family. Prior to entering the agreement with AM, Julio Loizzo met with AM officers at their headquarters in Pennsylvania. There Loizzo introduced himself as Archon's president. and explained that Archon did significant underground utility work for Illinois Bell Telephone Company in the same Chicago suburbs in which Warner's cable television system was to be installed. Loizzo indicated he was starting a new company (Nohcra) specifically to do cable installation work and was interested in submitting a bid for the Warner Amex project. Liability Trans. at 9; 18–20.

Loizzo testified he told AM officers that, although Nohcra had no existing equipment, it would be purchasing trucks, trenchers, plows and boring equipment if it were successful in landing the bid with AM. Loizzo emphasized he had no prior experience in cable-tv installation, but that the work was very similar to their utility work with Illinois Bell, and that he was familiar with northwest Chicago's suburban area. Liability Trans. at 20–21. The district court credited the testimony of an AM officer who, corroborating Loizzo's testimony, acknowledged that he was aware of Nohcra's inexperience in cable-tv installation. Liability Trans. at 765. We believe the district court's finding—that AM failed to prove it had been fraudulently induced to enter into its subcontract agreement with Nohcra—was not clearly erroneous, and affirm this portion of the district court's judgment.

### CONCLUSION

We affirm the district court's judgment that Nohcra performed its contractual obligations in a commercially reasonable and acceptable manner, and that AM's termination of the contract was not done in good faith. We vacate the district court's award of compensatory damages for work per-

10. the palindrome of Nohcra.

formed and remand for a determination of specifically which invoices and work reports AM acknowledged as complying with the contract for which compensation is due. The award of prejudgment interest is affirmed, to be modified by the district court only as necessary to reflect interest owing on the district court's revised "work performed" award. We reverse the district court's award of lost profits because the parties' contract did not contemplate such an award, as Pennsylvania law requires. Finally, we affirm the district court's dismissal of AM's counterclaim.

COFFEY, Circuit Judge, dissenting in part.

I dissent from parts I., II.A., and III. because the majority has misconstrued Pennsylvania law,[1] but I join with the majority in holding that Nohcra is not entitled to future damages even if AM had breached its contract.

The contract at issue in this case primarily involved digging simple trenches through lawns, laying television cable in them, and then restoring the lawns to their original condition. There is nothing "sophisticated" or complicated about digging and filling these trenches, as portrayed by the majority; rather, the trenches merely required the ordinary, physical energy of day labor construction people, not talented craftsmen of any nature. When Nohcra failed to follow the simple backfilling procedures in the specs (tamping the dirt when backfilling) and thus failed to restore the lawns to their original condition (the vast majority of the trenches settled, and there was a great deal of other damage), AM terminated the contract. Nohcra's shoddy performance constitutes a material breach of contract releasing AM from its obligation under the contract to pay for the work. But even if Nohcra's performance were not a material breach, under the proper test of Pennsylvania law, it certainly justified AM's termination of Nohcra according to the satisfaction condition of the contract.

The majority holds, in effect, that a satisfaction contract in a commercial setting is subject to a standard of "commercial reasonableness." This misinterpretation of Pennsylvania law would emasculate the doctrine of satisfaction and would prohibit a party from canceling a contract for unsatisfactory performance even when such specific satisfaction language is contained in the contract, as the one before us. An objective "commercial reasonableness" standard is not and never has been the law of the state of Pennsylvania regarding satisfaction contracts; nor does it comport with the agreement between the parties. The issue of whether AM properly terminated its contract with Nohcra turns on the proper application of Pennsylvania law to the terms of the agreement between the parties. When that issue is properly resolved, it is clear that AM's counterclaim should not have been dismissed.

## I. NOHCRA'S BREACH OF CONTRACT CLAIM

The majority agrees with the district judge that AM's termination of the contract and its refusal to pay Nohcra's progress payment invoices were breaches of contract. I disagree with the trial court's and the majority's interpretation of the contract as its language clearly provides AM with not only the discretion but also the authority to terminate the agreement if AM is not satisfied with Nohcra's performance. Upon termination, the contract clearly provides that no further payments are due until completion of the work, and any claims for progress payments are to be offset by AM's expenses in finishing the work. AM therefore was entitled to terminate the contract and to withhold further progress payments.

### A. Termination

Paragraph 17 of the contract between AM and Nohcra specifies and delineates a number of conditions that constitute just cause for AM to terminate the contract. The relevant condition for our purposes is

---

**1.** As the majority recognize, Pennsylvania law controls the breach of contract claim in accord-
ance with the parties' choice of law under the contract.

that Nohcra's performance must satisfy AM:

"Anything herein to the contrary notwithstanding, *all work performed by Subcontractor shall be to the satisfaction of Purchaser. If Purchaser shall be of the good faith opinion that Subcontractor is not properly performing the work in accordance with the terms of this Subcontract,* or is delaying other subcontractors of either Purchaser or Customer, or is not adhering to the Progress Schedule, then *Subcontractor,* upon written notice from Purchaser, *shall be deemed to be in breach of this Subcontract....*" (Emphasis added.)

The second sentence of this paragraph clarifies what will justify AM's termination of the contract if "all work performed by [Nohcra was not] to the satisfaction of [AM]": If AM were to be *"of the good faith opinion that Subcontractor is not properly performing the work in accordance with the terms of th[e] Subcontract,"* AM had a legal right to terminate the agreement. As will be seen below, AM had more than adequate reason to have such a good faith opinion.

The Underground Installation Procedures, attached and made a part of the contract as Schedule A, describes what constitutes "good installation techniques." The first requirement was that the installation crews were to use a sod cutter to remove the sod before digging trenches in order that the sod might be reusable. Plaintiff Exhibit 3, page 3–20. If the soil from a trench contained rocks or other debris that would damage the cable, Nohcra was obligated to install

"a *four inch (4") layer of sand* ... in[ ] the trench around the cable as a protection pad prior to backfilling.... The trench line is then *tamped to prevent settlement* and the five-foot (5') length [sic] of sod previously removed are replaced and tamped. The sod should be *provided with adequate water and care* until the roots have again become permanent." *Id.* at 3–22 (emphasis added).

Uncontroverted evidence established that Nohcra failed to comply with these Underground Installation Procedures as required under the contract. Nohcra neither saw fit to use sod cutters nor to water the sod that it later replaced; a great deal of the sod that Nohcra installed died because it was not "provided with adequate water and care until the roots ... again bec[a]me permanent." The record shows that Nohcra even failed to supply its crews with tampers for its small trenches and also failed to buy tampers for the large trenches until shortly before or perhaps even after AM terminated the contract. Indeed, Nohcra's superintendent instructed the workers to tamp the soil with four-by-fours. Furthermore, Nohcra's superintendent testified that in some cases it was impossible to tamp the soil because the rocks and other rough material in the soil would have ruined the cable—he clearly paid no attention to the contract requirement of protecting the cable with a sand pad if there were rocks that might damage it. Had Nohcra followed the contract specifications (sand pad), tamping would not have caused a problem. Undisputed evidence, however, established that Nohcra's slipshod procedure of backfilling without properly compacting the soil (and then hauling away the excess soil) resulted in the vast majority of the trenches settling, some of them egregiously.[2] This backfilling procedure, combined with the failure to use a protective sand pad in rocky soil (thus endangering a break in the television cable), is sufficient to constitute a material breach of the contract. Moreover, it certainly justifies a subjective good faith belief that Nohcra was "not properly performing the work in accordance with the terms of th[e] Subcontract."

Nevertheless, in his Findings of Fact and Conclusions of Law, May 19, 1988, the district judge somehow concluded that "Nohcra performed the work it was assigned in a commercially reasonable and acceptable

---

**2.** The assertion in Nohcra's brief that "Nohcra would have had no incentive to [haul away the dirt] because it is in fact much harder to haul

excess material away than it is to tamp it back into the hole" fails to contradict the testimony that Nohcra in fact *did* haul the dirt away.

manner."[3] Findings of Fact ¶ 33. He then concluded as a matter of law that AM's termination of the contract "was not done in a good faith belief that it had a reason to terminate the Agreement under paragraph 17 of the Agreement." Conclusions of Law ¶ 3. The majority recognizes that the issue of whether the dissatisfaction was in good faith is a question of fact under Pennsylvania law, and then states that "[t]here is no objective standard" for determining whether the dissatisfaction of a party is genuine. Majority Opinion, p. 1011. At the same time, the majority somehow accepts the trial judge's objective conclusion that AM's termination of the contract was unreasonable because of Nohcra's allegedly commercially reasonable performance.

The majority finds persuasive the district court's finding that AM failed to give Nohcra notice of its dissatisfaction prior to termination. Neither the contract nor Pennsylvania law, however, requires notice of dissatisfaction prior to termination. Thus the issue of whether AM notified Nohcra of its dissatisfaction is irrelevant to the question of whether AM's dissatisfaction was genuine. But even if such notice were necessary, the record speaks for itself that there was adequate notice, and the district judge's finding was clearly erroneous. Nohcra's own exhibits establish that Nohcra was well aware of AM's dissatisfaction with Nohcra's production rate. One exhibit is a letter to Nohcra's owner about three weeks before termination requesting that Nohcra schedule overtime work in order that it might meet its schedule of forty miles a month. The last paragraph of the letter states: "If the production does not increase, AM will subsidize the Underground Construction effort with *whatever means are necessary.*" Plaintiffs exhibit 47 (emphasis added). I emphasize that this was *plaintiff's* exhibit—I fail to comprehend how the trial judge could find that Nohcra was unaware of AM's displeasure. In addition, there is a tremendous amount of documentary evidence demonstrating that Nohcra was receiving constant complaints from Warner Amex, the cable television franchisee about homeowner complaints: Nohcra left a pile of dirt on a manhole cover and ruined a fence at one home (AM exhibit 27); Nohcra ran a power trencher beside a tree and cut some of its main roots (AM exhibit 37); Nohcra backfilled a trench so poorly that when the owner stepped on it after a rain, he sank two feet—after repeated efforts to get Nohcra to fix the trench, the owners bought topsoil from K MART and fixed it themselves (AM exhibit 58); a seventy-seven-year-old woman repaired some landscaping herself, and she complained that Nohcra used grass seed rather than sod in restoring her lawn (AM exhibit 62); Nohcra "ripped-up" a five inch drain tile in a lawn and had not yet repaired it a week later (AM exhibit 66); a homeowner was so irate with Nohcra's poor restoration that he was threatening to "chop up" the television cable (AM exhibit 71); and so forth. Furthermore, the photographs in the record (AM exhibits 55, 145–154) show completely unacceptable work—mounds of dirt on top of trenches, soil eroded by rain, sunken trenches, torn-up lawns, and damaged trees. These pictures alone are more than sufficient to establish that Nohcra should have been on constructive notice that its work was not just unsatisfactory but unacceptable. Thus Nohcra had more than adequate notice that AM was dissatisfied with its performance.

*The district court failed to make a finding in the record regarding the question of whether AM was in fact genuinely dissatisfied with Nohcra's performance.* Rather than focusing on the genuineness of AM's dissatisfaction, the trial judge's findings indicate that he applied an objective "commercial reasonableness" standard to AM's dissatisfaction with Nohcra's performance. To the contrary, the Pennsylvania law of satisfaction contracts applies a *subjective* standard to a party's dissatisfaction, thus such an *objective* consideration

---

**3.** The record does not indicate the extent of AM's expenses in re-constructing and backfilling Nohcra's trenches because the trial court dismissed AM's counterclaim and did not permit AM to establish its damages.

of whether Nohcra met the requirements of the contract is erroneous; the only relevant issue is whether AM was genuinely dissatisfied with Nohcra's work. Because the majority in its misapplication of Pennsylvania law has compounded the district court's error, a brief overview of the Pennsylvania law on satisfaction contracts is necessary.

*Jenkins Towel Service, Inc. v. Tidewater Oil Co.*, 422 Pa. 601, 223 A.2d 84 (1966), is the leading Pennsylvania case on satisfaction contracts. Jenkins Towel Service [hereinafter Jenkins] contracted to sell Tidewater Oil Company [hereinafter Tidewater] a piece of property for a service station. The contract required permits for cuts in the curb to allow access into the service station from the street. The city refused to issue permits for curb cuts as large as those required under the contract, and Jenkins subsequently offered an alternative plan to Tidewater. Because the alternative plan failed to meet the requirements of the contract, Tidewater terminated the agreement. The court implied a satisfaction contract from the requirement in the contract that Jenkins obtain permits as required by Tidewater. In considering Tidewater's dissatisfaction, the court said:

> "Such [satisfaction] contracts are not strangers to the law of Pennsylvania and have been considered by us on numerous previous occasions. We have consistently held that where a contract provides for performance by one party to the satisfaction of the other, '*the test of adequate performance is not whether the person for whom the service was rendered ought to be satisfied, but whether he is satisfied,* there being, however, this limitation, that any dissatisfaction on his part must be genuine and not prompted by caprice or bad faith.' (Emphasis in Orgl.) *Kramer v. Phila. Leather Goods Corp.*, 364 Pa. 531, 73 A.2d 385 (1950); *Burke v. Daus. of Holy Redeemer*, 344 Pa. 579, 26 A.2d 460 (1942); *Singerly v. Thayer*, 108 Pa. 291, 2 A. 230 (1885)." (Emphasis added.)

422 Pa. at 606, 223 A.2d at 86. The trial court had found that Tidewater's termination of the contract "was not made in bad faith, was not capricious and was not motivated by dissatisfaction with any provision of the contract" but was motivated only by Jenkins' failure to perform as required. *Id.* As in *Jenkins*, the issue in the instant case "is not whether [AM] *ought* to be satisfied, but whether [AM] *is* satisfied." *Id.* (Quoting *Kramer v. Phila. Leather Goods Corp.*, 364 Pa. 531, 73 A.2d 385 (1950)) (emphasis in original); AM's dissatisfaction was with Nohcra's failure to perform in accordance with the clear and unambiguous terms of their contract, not with the language of the contract itself.

The majority of cases following *Jenkins*, both state and federal, have found that a party who terminated a satisfaction contract did so with sincere dissatisfaction. *Aster v. BP Oil Corp.*, 412 F.Supp. 179 (M.D.Pa.1976), *aff'd*, 549 F.2d 794 (3d Cir. 1977) (seller of land failed to provide satisfactory sewage system as required by sales contract); *Canonsburg Supply & Equipment Co. v. John Deere Industrial Equipment Co.*, 388 F.Supp. 135 (W.D.Pa.1975) (retail dealer's performance failed to satisfy John Deere); *Marine Transport Lines, Inc. v. Publicker International, Inc.*, 303 F.Supp. 423 (E.D.Pa.1969) (the cleanliness of tanks in a ship failed to satisfy charterer's inspector). Indeed, I have found only one Pennsylvania case dealing with satisfaction contracts in which a party's dissatisfaction was held to be in bad faith. In the following case, *Commonwealth of Pennsylvania, Department of Property and Supplies v. Berger*, 11 Pa.Cmwlth. 332, 312 A.2d 100 (1973), the dissatisfied party deliberately brought about an unsatisfactory situation in an unsuccessful attempt to break a lease.

In *Commonwealth of Pennsylvania, Department of Property and Supplies v. Berger*, 11 Pa.Cmwlth. 332, 312 A.2d 100 (1973), the Pennsylvania Department of Public Welfare (DPW)[4] agreed to lease two floors of a high-rise apartment building

---

**4.** The Department of Property and Supplies acted for DPW after the initial negotiations for the lease.

from the Bergers (the owners of the building) for office space. The DPW knew it could not use the space if constructed as planned, but the lease agreement provided for revisions at the lessor's expense (upon DPW's approval). Shortly after the lease was signed, a new secretary was appointed to head up the DPW. Not wanting the leased premises, he decided to try to break the lease by waiting until construction was complete and then making unreasonable demands for revisions. Thus when the Bergers submitted revised plans to DPW and repeatedly sought approval, the DPW gave no response. When the Bergers could wait no longer and still complete the construction within the time limits of the contract, they completed the two floors as originally planned and notified DPW that the premises were ready for occupancy. At this time the Commonwealth requested that the two floors be gutted and the newly installed walls, kitchens, and bathrooms, including the plumbing, be removed. The Commonwealth then attempted to terminate the lease because the Bergers refused to rebuild the finished apartments. The Bergers subsequently filed a breach-of-contract claim with the Board of Arbitration of Claims,[5] which awarded damages to the Bergers. The Commonwealth appealed to the Commonwealth Court of Pennsylvania.

Under the lease agreement, no rent was due until construction was completed to the satisfaction of DPW. Thus on appeal, DPW argued that it owed no rent because the premises were never completed to its satisfaction. The court found to the contrary that

"DPW knew that the floors involved were designed for apartment use, that they were being so constructed and that some changes and alterations were to be made so that they would be usable by the DPW. In fact, a plan for such altera-

tions was drawn up but never submitted to the Bergers. The DPW decided instead to break the lease and sought to accomplish this result by preparing new plans as if only the shell of the building was involved, completely ignoring apartment walls, kitchens, bathrooms and closets."

312 A.2d at 105. The court concluded that the Commonwealth's dissatisfaction was not in good faith because its motive was improper; the DPW's dissatisfaction was contrived.

*Berger* is a clear example of the kind of egregious conduct required under Pennsylvania law to find that a party's dissatisfaction is in bad faith. For AM's conduct to be as egregious as the Commonwealth's, AM would have had to cause Nohcra's malfeasance deliberately. As indicated above, however, the record clearly establishes that Nohcra's failure to comply with the contract specs was deliberate. Thus AM did not bring about the unsatisfactory situation.

The most recent Pennsylvania case to construe satisfaction contracts is *Stern v. Vic Snyder, Inc.*, 325 Pa.Super. 423, 473 A.2d 139 (1984). Stern had entered an employment contract with Vic Snyder, Inc. that allowed for termination if the corporation became dissatisfied with Stern's performance. At trial, the judge instructed the jury to determine first whether Vic Snyder, Inc. was in fact dissatisfied, and if so, whether that dissatisfaction gave them a right to terminate the contract. The appellate court found the instruction to be in error because "[t]he jurors were not instructed to determine whether the dissatisfaction was sincere or genuine." The court ordered a new trial.[6]

The trial judge's treatment of AM's good faith is analogous to the erroneous jury

---

**5.** The opinion does not indicate why the Bergers filed their claim with the Board of Arbitration of Claims rather than in court, but I assume Pennsylvania law requires filing claims against the Commonwealth as administrative claims before that tribunal.

**6.** This case was resolved in *In re Vic Snyder, Inc.,* 50 B.R. 631 (E.D.Pa.1985), a bankruptcy

proceeding. The issue turned on conflicting testimony about the motive in terminating Stern. While the court did not accept Vic Snyder, Inc.'s rationale for termination as valid, it recognized that the corporation was genuinely dissatisfied. The court did not need to "inquire into the reasonableness of the dissatisfaction." *Id.* at 636.

instruction in *Stern* because as fact finder, he is guilty of applying the wrong standard to the evidence. Indeed, the trial judge's approach to the issue was more erroneous in that the judge failed to decide whether AM was in fact dissatisfied, let alone whether the dissatisfaction was subjectively sincere rather than contrived.

The legal theory of the above cases is that Pennsylvania law allows for the termination of satisfaction contracts unless it can be demonstrated that the dissatisfied party has an improper motivation. In the instant case, Nohcra failed to present one scintilla of evidence demonstrating improper motivation on the part of AM much less submit any plausible theory of an improper motivation;[7] in fact, the record sets forth an abundance of evidence (failure to use sod cutters, failure to water sod, crevices in improperly filled trenches, failure to tamp soil, failure to protect cable with a sand pad, and so forth) that should be construed to provide a valid motivation.

In light of the foregoing, this issue should be remanded to the district court for a determination of whether AM's dissatisfaction was in fact genuine. Because Nohcra failed to establish this key element of an improper motivation, the record speaks most eloquently in reciting that AM did not breach the contract. In order to find that AM's dissatisfaction was prompted by bad faith, convincing evidence must clearly demonstrate an improper motivation.

### B. Withholding of Progress Payments

Clear and unambiguous language in the contract authorizes AM to withhold progress payments upon termination of the contract:

> "In the event of termination as provided in 'B' above, Purchaser ... may finish the work by any method that Purchaser deems expedient. In such case, *Subcontractor shall not be entitled to further payment until the completion of the work.* If such expense shall exceed any unpaid balance of the Contract price, Subcontractor shall pay the difference to Purchaser."

Paragraph 17 (Emphasis added). This provision justifies AM's withholding further progress payments until the project was certified as completed to their satisfaction. And if AM incurred expenses in finishing work billed by Nohcra, AM is entitled to offset its expenses. The majority ignores this provision of the contract, however, and, in effect, rewrites the contract to require full payment of any claims at the time of termination and to delete the contract requirement of final approval before final payment. Their justification for this reformation appears to be the trial judge's finding that Nohcra's failure to meet the contract rate of production (forty miles per month) and to build a workable system was due to circumstances beyond its control—circumstances such as problems in locating other underground utilities (gas, telephone, electric, and water).

The majority's apparent justification for redrafting the contract ignores the fact that Nohcra had represented itself as an expert in handling the location of underground utilities in the area. Moreover, Nohcra's representation in paragraph 9 of the contract is an express assumption of the risk of pre-existing problems such as difficulties in locating underground utility lines:

> "Subcontractor represents that it has made (prior to the execution hereof) a careful examination of the nature and location of the work, the general and local conditions prevailing at the construction site, has discovered all other matters which may in any way affect the work, and *waives any right to make any claims for loss or damage or use the same as an excuse for its non-performance."* (Emphasis added.)

Nohcra's representation and waiver precludes it from raising a foreseeable problem "which may in any way affect the work ... as an excuse for its non-performance." Nohcra should have been in the best position to foresee its problems with underground utility locations because it knew the area and represented that it had experience in working with the utility com-

---

**7.** Nohcra failed to allege an improper motive in its pleadings, and it raised a "scapegoat" theory for the first time at oral argument (it claimed that AM terminated Nohcra to assuage Warner Amex's dissatisfaction with AM). Nohcra waived this theory by not raising it at trial.

panies. Thus, the adverse conditions that impress the majority fail to excuse Nohcra's performance or to justify a reformation of the contract. Consequently, neither terminating the contract nor withholding the progress payments put AM in breach of the contract, and Nohcra has no damages under either cause of action.

## II. NOHCRA'S DAMAGES FOR WORK PERFORMED

Paragraph 4 of the contract, entitled PROGRESS PAYMENTS, provides for periodic payments during the course of the contract:

"A. Not more frequently than weekly, Subcontractor may submit to Purchaser, for *initial approval*, a work report on Purchaser's forms, setting forth the amount of units completed during the period covered together with all necessary supporting documentation. Upon *initial approval*, Subcontractor can invoice for said work which Purchaser shall pay within thirty (30) days after receipt, ninety (90%) percent of the amount invoiced.
B. *Final payment* of all monies due Subcontractor hereunder shall be made within sixty (60) days after completion and *final acceptance* of the work by the Field Supervisor of Purchaser evidenced by a *final certification*...." (Emphasis added.)

This language clearly indicates that AM's supervisor's signature on work reports certifies AM's *initial approval only*, thus allowing Nohcra to claim a *progress payment* for the amount of work reflected on the work progress report. Paragraph 18, FINAL INSPECTION, ACCEPTANCE, AND PAYMENT, provides that "[t]he amount due to Subcontractor as the final payment *shall not be made* until final inspection and acceptance of the work by [Warner Amex] and [AM].... *After final inspection and approval* of the work by [Warner Amex] and [AM], final payment shall be made by [AM] to Subcontractor for that portion of the system inspected and accepted." Paragraph 21 also indicates an expectation of a "final acceptance" in the requirement that Nohcra carry insurance on all aspects of its work until *"final ac-*

*ceptance of the work."* The cited language clearly demonstrates that the invoices for progress payments did not entitle Nohcra to full payment of the contract price until final acceptance.

Notwithstanding the contract language, the trial judge improperly awarded Nohcra $172,123.62 as if the work performed before AM's termination of the contract were certified as completed. He based this award on Nohcra's exhibit 1, which consisted of weekly work progress reports summarizing the work performed each week and invoices that merely reflected the contract price of the work reported to justify partial payments. The judge concluded that because AM's supervisors signed some of these work reports, they "were approved by AM and constitute admissions on its part that the work was performed according to the contract and that Nohcra was entitled to payment." Memorandum Opinion and Order at 2, 1989 WL 44364 (Apr. 24, 1989).

Even if I were to agree with the majority that Nohcra is entitled to compensation for the work performed, the trial judge's broad, overly expansive use of Nohcra's Exhibit 1 is erroneous as a matter of law in light of the clear and unambiguous language of the contract. Nohcra has never alleged that it has obtained final inspection and approval of its work. Thus, even if we were to agree with the trial judge's findings, which we do not, only ninety percent of the invoices is owed to Nohcra, and that amount must be offset by AM's cost in repairing and restoring Nohcra's work up to specs.

## III. AM'S COUNTERCLAIM

Uncontroverted evidence established that Nohcra failed to obtain the proper equipment necessary for backfilling trenches according to the specs, and as a result thereof, most of the trenches settled (some as much as two feet (24″) in depth). Whether that generated "an excessive number of homeowner complaints," or whether Nohcra's work was commercially reasonable, is irrelevant to the issue of whether AM suffered loss in repairing and replacing Nohcra's work. Paragraph 14(A) of the contract was a guarantee by Nohcra that its

work would remain in conformance with the requirements of the contract for a period of one year, and that Nohcra would reimburse AM if AM incurred expenses because of defects. Because the trial judge erroneously dismissed AM's counterclaim for restitution, AM was not allowed to demonstrate its actual expenses from repairing and replacing Nohcra's work. AM's counterclaim for restitution should be reinstated, and at the new trial, AM should be allowed to establish damages in accordance with paragraph 14(A) of the contract.

## CONCLUSION

I would vacate the decision of the district court and remand for a new trial because of the trial judge's misapplication of Pennsylvania law. At the new trial, the judge must apply Pennsylvania law to determine whether AM's dissatisfaction was in fact genuine, whether AM in fact owes Nohcra ninety percent of the progress payment invoices, whether and in what amount AM incurred damages as a result of repairing and replacing Nohcra's defective work, and whether AM is entitled to damages under its counterclaim. I respectfully dissent.